840 P.2d 1042

**In the Matter of MARICOPA COUNTY
CAUSE NO. MH–90–00566.**

**No. 1 CA–CV 90–648.**

Court of Appeals of Arizona,
Division 1, Department D.

Sept. 3, 1992.

**179**

Dean W. Trebesch, Maricopa County Public Defender by Gary F. Forsyth, Deputy Public Defender, Phoenix, for appellant.

Grant Woods, Atty. Gen. by Vicki Gotkin Adler, Asst. Atty. Gen., Phoenix, for appellee.

## OPINION

EHRLICH, Judge.

L.R.[1] appeals from an order committing him to the Arizona State Hospital ("ASH") for inpatient treatment and subsequent supervised outpatient treatment. The court found that L.R. was persistently or acutely disabled as the result of a mental disorder, in need of treatment and either unwilling or unable to accept voluntary treatment.

On appeal, L.R. challenges the constitutionality of Ariz.Rev.Stat.Ann. section ("A.R.S. §") 36–501(29), which establishes "persistently or acutely disabled" as a category for the involuntary commitment of the mentally ill. He argues that the statute is overbroad and vague and that its application violates substantive and procedural due process rights. L.R. further maintains that, even if the statute under which he was involuntarily committed is constitutional, there was insufficient evidence to support the conclusion that he was persistently or acutely disabled.

We hold that A.R.S. § 36–501(29) is constitutional. We further conclude that the evidence supported the order of involuntary treatment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

L.R. suffers from schizophrenia, paranoid type. He is "chronically mentally ill" as defined by A.R.S. § 36–550(3).[2] In July 1990, L.R. admitted himself to the Maricopa County Medical Center because he was afraid that he would harm other people by acting on command hallucinations he was experiencing. He called the voice within him "John," and "John" was making all of his major decisions. L.R. previously had received treatment for his mental illness but, some months prior to his admission to the medical center, he had stopped taking the anti-psychotic medication.

On August 6, 1990, L.R. was transferred to ASH. While there, he believed that his parents had hired many of the patients to spy on him for them. L.R. told several hospital employees that "John" wanted him to get a gun for protection after he got out of the hospital. Then, and against his doctors' advice, L.R. attempted to sign out of ASH because "John" had told him to do so. As a result, the hospital's chief medical officer petitioned the superior court for court-ordered inpatient and outpatient treatment for L.R.

At the hearing on the petition, Dr. Marcelle Leet, a psychiatrist who was treating L.R., testified that, in her opinion, L.R. was persistently disabled because he suffered from symptoms of schizophrenia involving auditory hallucinations and paranoid delusions and that, if he acted on those, it could be dangerous for himself and others. She specifically noted that his persecutory delu-

---

1. In the interests of the individual's privacy, the name of the appellant has been deleted and his initials substituted.

2. In relevant part, A.R.S. § 36–550(3) provides: "The 'chronically mentally ill' are persons, who as a result of a mental disorder as defined in § 36–501 exhibit emotional or behavioral functioning which is so impaired as to interfere substantially with their capacity to remain in the community without supportive treatment or services of a long-term or indefinite duration."

Section 36–501 in turn states in pertinent part: "29. 'Persistently or acutely disabled' means a severe mental disorder that meets all the following criteria: (a) If not treated has a substantial probability of causing the person to suffer or

continue to suffer severe and abnormal mental, emotional or physical harm that significantly impairs judgment, reason, behavior or capacity to recognize reality. (b) Substantially impairs the person's capacity to make an informed decision regarding treatment and this impairment causes the person to be incapable of understanding and expressing an understanding of the advantages and disadvantages of accepting treatment and understanding and expressing an understanding of the alternatives to the particular treatment offered after the advantages, disadvantages and alternatives are explained to that person. (c) Has a reasonable prospect of being treatable by outpatient, inpatient or combined inpatient and outpatient treatment."

sions and paranoid ideations were painful psychic experiences for him that adversely affected his relationships with other people and his ability to function outside of the hospital. In fact, L.R. already had engaged in assaultive behavior against members of his family. Dr. Leet believed that if L.R. were released from the hospital, he could act on his fear that other people wanted to harm him, which could lead to an altercation and injury.

Because the doctors had not yet found a medication to effectively treat L.R.'s illness without debilitating side effects, Dr. Leet wanted L.R. to remain at ASH so that they could try other medications and monitor his progress. She testified that L.R. was ambivalent about treatment and that she did not believe that he would comply with outpatient treatment. Dr. Leet had discussed the advantages and disadvantages of inpatient treatment with L.R. and, although she believed that he had some understanding of the treatment alternatives, she concluded that his decision-making was influenced by the command hallucinations such that he was unable to give an informed consent or make a decision regarding his treatment. Dr. Leet recommended that L.R. stay at the hospital for six months so that they could attempt to find an appropriate medication, stabilize him and get him ready for outpatient treatment. She further recommended that the court order the full 365 days of combined inpatient and outpatient treatment allowed by law.

Another psychiatrist, Dr. Laxman Patel, testified regarding his interviews with L.R. at ASH. He noted that L.R.'s judgment was impaired as exhibited by the fact that L.R. had no idea where he would live if discharged from ASH, planning to stay on the streets beside the freeway until "John" could find him a place to live. It was Dr. Patel's opinion also that L.R. was persistently and acutely disabled and that he should receive combined inpatient and outpatient treatment for 365 days.

The court found clear and convincing evidence that L.R. was persistently and acutely disabled as the result of a mental disor-

der, in need of treatment and either unwilling or unable to accept voluntary treatment. It ordered L.R. to undergo combined inpatient and outpatient treatment until he was found to be no longer persistently or acutely disabled as a result of his mental disorder, the treatment period not to exceed 365 days, with the period of inpatient treatment not to exceed 180 days. L.R. timely appealed from this order.

## II. DISCUSSION

### A. Mootness

A preliminary issue to be resolved is whether L.R.'s appeal is moot. His involuntary treatment ended on August 29, 1991, but our jurisdiction is not necessarily defeated once the challenged order has expired if the dispute is capable of repetition yet evading review. *KPNX Broadcasting Co. v. Maricopa County Superior Court,* 139 Ariz. 246, 250, 678 P.2d 431, 435 (1984), citing *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 2796, 49 L.Ed.2d 683 (1976). *See also In re McMullins,* 315 Pa.Super. 531, 462 A.2d 718, 720 (1983) (appeal not moot because involuntary commitment order affects important liberty interest and most such orders expire before appellate review possible). L.R. has been identified as chronically mentally ill and thus may be subject to petitions for involuntary treatment in the future; certainly, other similarly-situated persons will be subject to such petitions. Because appeals usually are not briefed and decided in less than the 365–day maximum period of treatment allowed by law, appeals from these orders would evade review if made moot by the expiration of the order. In addition, a challenge to the constitutionality of a mental health treatment statute involves a matter of continuing and substantial public interest, such that it is appropriate for us to consider the issue. Thus, we decide this appeal on its merits.

### B. Alleged Unconstitutionality of A.R.S. § 36–501(29) [3]

"If the court finds by clear and convincing evidence that the proposed patient is,

---

**3.** In *In re Pima County Mental Health No. MH 2081–3–90,* 169 Ariz. 141, 142, 817 P.2d 945, 946

as a result of mental disorder, a danger to himself, is a danger to others, is persistently or acutely disabled or is gravely disabled and in need of treatment, and is either unwilling or unable to accept voluntary treatment, the court shall order him to undergo" either outpatient treatment, combined inpatient and outpatient treatment, or inpatient treatment for a time not to exceed certain specified periods. A.R.S. § 36–540(A). In this case, the court found that L.R. was persistently or acutely disabled, in need of treatment and either unwilling or unable to accept voluntary treatment.

L.R. now argues that A.R.S. § 36–501(29), defining "persistently or acutely disabled," particularly as read with § 36–501(22), defining "mental disorder," [4] is vague and overbroad because it could subject nearly anyone suffering from a mental disorder to involuntary treatment and because it is indefinite and cannot be understood by persons of common intelligence. He also argues that court-ordered treatment based upon a persistent or acute disability violates the patient's substantive and procedural due process rights because this standard is unconstitutionally vague.

▇▇▇ Overbreadth and vagueness are different concepts as they pertain to due process.[5] A mental health involuntary treatment statute is overbroad if its application could result in the hospitalization of mentally-ill persons who are neither dangerous nor incapable of adequately caring for themselves. *See Project Release v. Prevost,* 722 F.2d 960, 972 (2d Cir.1983). Such a statute is vague if "it lacks ascertainable standards of conduct and is so vague, imprecise and indefinite that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *In re Slabaugh,* 16 Ohio App.3d 255, 475 N.E.2d 497, 499 (1984). *See also State v. Tocco,* 156 Ariz. 110, 113–14, 750 P.2d 868, 871–72 (App.1988) ("Only where a statute proscribes no comprehensible course of conduct at all is it unconstitutional as applied to any set of facts."); *State v. Jacobson,* 121 Ariz. 65, 70, 588 P.2d 358, 363 (App.1978) ("essential test of vagueness is whether the legislative enactment may be understood by persons of common intelligence"). Alleged overbreadth primarily concerns substantive due process because it questions whether the statutory standards "provide a constitutionally adequate basis for detention." *La-Belle,* 728 P.2d at 142. The question of vagueness implicates "the procedural due process requirements of fair notice of the conduct warranting detention and clear standards to prevent arbitrary enforcement by those charged with administering the applicable statutes." *Id.*

(App.1991), Division 2 of this court held that A.R.S. § 36–501(29) is constitutional. Although we agree with the holding of that opinion, we consider the arguments raised by L.R. because not all of them were addressed in that case.

4. " 'Mental disorder' means a substantial disorder of the person's emotional processes, thought, cognition or memory. Mental disorder is distinguished from: (a) Conditions which are primarily those of drug abuse, alcoholism or mental retardation, unless, in addition to one or more of these conditions, the person has a mental disorder. (b) The declining mental abilities that directly accompany impending death. (c) Character and personality disorders characterized by lifelong and deeply ingrained antisocial behavior patterns, including sexual behaviors which are abnormal and prohibited by statute unless the behavior results from a mental disorder."

5. The state argues that L.R. does not have standing to challenge the statute on the ground of overbreadth, relying on *State v. Carruth,* 132

Ariz. 368, 645 P.2d 1282 (App.1982). The court in *Carruth* stated that unless a challenged statute regulated the exercise of first amendment rights, its constitutionality could not be challenged on the ground that it might apply to parties not before the court. *Id.* at 370, 645 P.2d at 1284. The court did acknowledge, however, that "innocent" activity regulated by an overbroad statute must at least be actively protected by the Bill of Rights. *Id.* We note also that a number of courts in other jurisdictions have considered overbreadth challenges to mental health treatment statutes without questioning whether the patient had standing to challenge the statute on that ground. *E.g., Project Release v. Prevost,* 722 F.2d 960 (2d Cir.1983); *In re LaBelle,* 107 Wash.2d 196, 728 P.2d 138 (1986). In addition, we construe L.R.'s argument to be that the statute is overbroad because it allowed *his* commitment solely because he was mentally ill. Thus, we consider the overbreadth arguments.

Although the arguments regarding overbreadth and vagueness overlap to some extent, we first analyze L.R.'s arguments regarding overbreadth. L.R. maintains that application of A.R.S. § 36–501(29) could subject to involuntary treatment every person with a mental disorder because, by definition, everyone with a mental disorder has a "substantial disorder of ... emotional processes, thought, cognition or memory" necessarily resulting in mental or emotional harm affecting or impairing "judgment, reason, behavior or capacity to recognize reality." His conclusion then is that the statute is fatally overbroad because it mandates the treatment of everyone who is chronically mentally ill without requiring proof of dangerous behavior or the necessity of court-ordered treatment.

 Commitment to a mental hospital indeed involves "a massive curtailment of liberty" that can have adverse social consequences or significant unfavorable stigma. *Vitek v. Jones*, 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1262–63, 63 L.Ed.2d 552 (1980); *Addington v. Texas*, 441 U.S. 418, 425–26, 99 S.Ct. 1804, 1808–09, 60 L.Ed.2d 323 (1979). Consequently, because civil commitment constitutes a significant deprivation of liberty, the state must accord the proposed patient due process protection. *O'Connor v. Donaldson*, 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (1975).

The Court in *O'Connor* observed that the grounds upon which a state justifies the involuntary confinement of mentally ill persons include preventing injury to the public, ensuring the person's own survival or safety and alleviating or curing his illness. *Id.* at 573–74, 95 S.Ct. at 2492–93. It described the constitutionally-adequate basis on which a person could be involuntarily confined for treatment of mental illness:

A finding of "mental illness" alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.

\* \* \* \* \* \*

In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends.

*Id.* at 575, 576, 95 S.Ct. at 2493, 2494. *See also Slabaugh*, 475 N.E.2d at 499 (no constitutional basis for involuntarily confining mentally-ill person simply because he would benefit from hospitalization).

 The Court in *O'Connor* also recognized that, in addition to being able to exercise its police powers by confining mentally-ill persons to protect others from danger, a state is vested with *parens patriae* power. 422 U.S. at 582–83, 95 S.Ct. at 2497–98. Under this power, a state may provide care for citizens who, due to emotional or mental disorders, are unable to care for themselves. *Addington*, 441 U.S. at 426, 99 S.Ct. at 1809. The humanitarian motives of the state justifying the *parens patriae* doctrine, however, do not insulate the use of the power from due process requirements. *Colyar v. Third Judicial Dist. Court for Salt Lake County*, 469 F.Supp. 424, 429 (D.Utah 1979).

The court in *Colyar* explained the constitutional parameters of the *parens patriae* power:

The state clearly has a legitimate interest in protecting its citizens from harm, whether the source of the harm is from other citizens or from the citizen himself. An individual who cannot provide for himself the basic necessities of life (food, clothing, shelter) or who inflicts physical damage on himself, and who, because of a mental illness, cannot make a rational decision to receive treatment, does pose a threat to his own well-being. Such a person is a danger to himself *not primarily* because his illness prevents him from seeking treatment, but rather because his illness prevents him from taking basic care of himself *and* from en-

gaging in any behavior (i.e., seeking treatment) that would ameliorate his condition. The state, under the parens patriae power, has a legitimate interest in involuntarily committing such an individual. [Citations omitted.]

*Id.* at 430–31 (emphasis original). Thus, in the context of an involuntary commitment, a mentally-ill person's danger to self may include the incapacity to provide the basic necessities of life, such as food, clothing and shelter, or an indication of an immediate risk of serious harm resulting to him if not treated promptly. *Id.* at 434. A person is dangerous to himself if he is "helpless to avoid the hazards of freedom." *O'Connor*, 422 U.S. at 574 n. 9, 95 S.Ct. at 2493 n. 9.

With these pronouncements in mind, we consider whether A.R.S. § 36–501(29) is unconstitutionally overbroad. We operate under the strong presumption in favor of the legislation's constitutionality, *Republic Inv. Fund I v. Town of Surprise*, 166 Ariz. 143, 148, 800 P.2d 1251, 1256 (1990); *Tocco*, 156 Ariz. at 112, 750 P.2d at 870, in examining the statute to determine whether it allows the confinement of mentally-ill persons who present no harm to themselves and who are capable of living safely outside the hospital.

■ According to § 36–501(29), "persistently or acutely disabled" means a severe mental disorder that meets three criteria. The first factor is that if the mental disorder is not treated, it "has a substantial probability of causing the person to suffer or continue to suffer severe and abnormal mental, emotional or physical harm that significantly impairs judgment, reason, behavior or capacity to recognize reality." We construe the beginning portion of the criterion to mean that there must be the real probability that the individual will suffer some danger of harm from his mental disorder if the condition is not treated. As such, this section of the statute would not allow the involuntary treatment of a mentally-ill person without a showing to the level of "substantial probability" of severe harm. The last phrase of this paragraph, "that significantly impairs judgment, reason, behavior or capacity to recognize reali-

ty," seemingly was included to clarify and specify the type of disability for which involuntary treatment is appropriate. Thus the physical harm resulting from a lack of food or shelter, for instance, apparently would not be enough unless there was further impairment as listed by the statute. If a person's mental disorder intensified due to lack of treatment, it is probable that the person would suffer impaired judgment, reason, behavior or capacity to recognize reality. The impaired behavior then well might involve life-threatening neglect of physical well-being or danger to others. This last phrase thus does not make the statute unconstitutionally overbroad. In fact, if anything, it limits the meaning of "persistently or acutely disabled."

■ In this context, L.R. also argues that the statute is defective because it requires only a "substantial probability" of harm rather than proven behavior or certainty of physical harm or illness, citing *O'Connor*. However, in *O'Connor*, the Court held only that a statute cannot serve to confine a nondangerous, functioning individual. 422 U.S. at 576, 95 S.Ct. at 2494. In *O'Connor's* case, there had been no showing either that he was dangerous to himself or to others or that he was incapable of survival with available assistance. *See also Stamus v. Leonhardt*, 414 F.Supp. 439 (D.Iowa 1976) (rejecting as unconstitutional Iowa statute permitting institutional placement of nondangerous mentally-ill person); *Doremus v. Farrell*, 407 F.Supp. 509 (D.Neb.1975) (rejecting Nebraska statute for same defect); *State v. Brungard*, 101 Or.App. 67, 789 P.2d 683 (1990) (upholding Oregon statute with appropriate safeguards).

Other courts considering such an argument have concluded in a similar manner that statutes are constitutionally adequate even though they do not require an "overt act" before a mentally-ill person can be involuntarily confined. In *Prevost*, the court was not convinced that the addition of an overt act requirement would reduce erroneous confinements and believed that the New York civil commitment scheme as a whole met minimum due process standards without the inclusion of an overt act

requirement. 722 F.2d at 973–74. *See also Colyar,* 469 F.Supp. at 434 (due process does not require that indications of incapability to make a rational treatment decision, and dangerousness to self and need of treatment be shown by recent overt act); *LaBelle,* 728 P.2d at 144 (substantial risk of harm need not be shown by recent, overt acts). We agree that the statute need not require an overt act as long as the statutory scheme provides, as Arizona's does, that the finding of persistently or acutely disabled must be based on clear and convincing evidence of a substantial probability of harm as required by A.R.S. § 36–501(29) and § 36–540(A).

 L.R. cites *Colyar* to support his challenge to the second criterion for a declaration of "persistently or acutely disabled," the factor that the mental disorder must substantially impair the person's capacity to make an informed decision regarding treatment. The court in *Colyar* found the Utah statute to be defective because it did not require the state to show that the individual was incapable of making a rational treatment decision. 469 F.Supp. at 432. The court believed that the statutory language equated an inability to make a responsible decision with an unwillingness to follow through with treatment, commenting:

> This equation is both too broad and too vague for it allows a court to commit a "mentally ill" person on the sole basis of the person's unwillingness to accept treatment, without finding that the individual is incapable of making a rational choice as to whether he wants treatment or not. In fact, the choice not to accept treatment becomes, under the statute, a basis *in and of itself* for commitment. [Emphasis original.]

*Id.* It noted that the use of the word "responsible" impermissibly focused the "attention on the *content* of the decision rather than on the ability of the individual to engage in a rational decision-making *process."* *Id.* at 433 (emphasis original). *See also LaBelle,* 728 P.2d at 146 (mere fact that individual mentally ill does not also mean incapacity to make rational choice regarding need for treatment).

We conclude that Arizona has avoided the problems of Utah. Subparagraph (b) of § 36–501(29) focuses on the mentally-ill individual's decision-making process rather than on the content of the decision. Under the statute, the advantages, disadvantages and alternatives must be explained to the mentally-ill person before it can be determined whether he is capable of engaging in a rational decision-making process. It provides that the impairment caused by the severe mental disorder must cause the person to be incapable of understanding and expressing an understanding of these advantages and disadvantages of accepting treatment and of the treatment alternatives available. Thus the statute provides a constitutionally-adequate means of determining an individual's capacity to understand and make an informed decision regarding treatment alternatives.[6]

 The third criterion requires that there be a reasonable prospect that the mental disorder be treatable by outpatient, inpatient or combined inpatient and outpatient treatment. A.R.S. § 36–501(29)(c). L.R. does not challenge this part of the statute *per se,* but he maintains that an order of combined inpatient and outpatient treatment is inherently ambiguous. He argues that because there is a finding that the patient can be adequately treated as an outpatient, inpatient commitment is unnecessary. However, it is clear in the statutory treatment scheme that these findings are necessary in a combined inpatient and outpatient order so that the patient can move from inpatient treatment to outpatient treatment without going through another court hearing. Indeed the most obvious conclusion from these findings is that

---

6. Division 2 of this court in *Appeal in Pima County Mental Health Case No. MH 1717–1–85,* 149 Ariz. 594, 596, 721 P.2d 142, 144 (App.1986), said generally:

> We doubt the applicability of the notion of "fair warning" to a class composed of those mentally incompetent to make judgments.

> Any risk of unbridled administrative discretion is eliminated by the requirement that commitments be made under judicial supervision after factual findings based on constitutionally appropriate standards. *See Stamus v. Leonhardt,* 414 F.Supp. 439 (D.Iowa 1976).

the court believed that a period of inpatient treatment was necessary but also that the patient would be successful in an outpatient plan once his condition is stabilized by inpatient treatment. The required findings are not defective.

■■■■ As said above, L.R. also argues that A.R.S. § 36–501(29) is unconstitutionally vague. We disagree. Vagueness arguments most commonly arise in criminal proceedings when it is particularly important that a statute be sufficiently precise to give notice to an ordinary person of conduct that is forbidden by the state. *See Tocco*, 156 Ariz. at 113–14, 750 P.2d at 871–72; *Jacobson*, 121 Ariz. at 70, 588 P.2d at 363. Even in a criminal context, however, due process does not invalidate every statute that might have been drafted with greater precision. *Id.* In resolving a vagueness challenge, "courts may properly consider the difficulties encountered by a legislative body in expressing certain concepts." *Jacobson*, 121 Ariz. at 70, 588 P.2d at 363 (citation omitted).

The difficulty in expressing concepts is particularly evident in mental health statutes. Because the field deals with variances in persons' minds and emotions, it is not possible to define with precision the elements that lead to a finding of mental illness or need for treatment. Thus, to require in mental health statutes the precision required in criminal statutes would be impossible and only undermine the state's interest with regard to mentally-ill persons. The statute is not unconstitutionally vague.

■■■■ L.R. argues that the Arizona statutory scheme violates procedural due process because it accepts as adequate pre-printed, standardized findings and conclusions and does not require detailed findings of fact. Although we agree that detailed findings of fact are desirable, we do not believe that the statute's failure to require such findings makes it violative of due process. In fact, a preprinted form may mean as a practical matter that each of the requisite findings is made. Further, an individual who is the subject of a commitment hearing may request written findings of fact pursuant to Arizona Rule of Civil Procedure 52. In addition, the hearing may be recorded so that, upon appeal, the transcript will be available for a determination whether the evidence was adequate to support the order.

## C. Sufficiency of Evidence to Support Trial Court's Ruling

■■■■ Finally, L.R. argues that even if § 36–501(29) is constitutional, the evidence was insufficient to support the court's conclusion that he was persistently or acutely disabled. From our review of the evidence, we conclude that the evidence was adequate to support the court's ruling.

The evidence showed that L.R. suffers chronically from schizophrenia, paranoid type, and that he believed other patients at the hospital were spying on him; he wanted a gun for his protection. The undisputed testimony of the two psychiatrists, as well as that of two ASH staff members, was that L.R. experienced command hallucinations from a voice he called "John" and that it was "John" that made L.R.'s significant decisions, commanding him to leave ASH and live on the streets by the freeway until "John" found him a place to live. L.R.'s own testimony supported the existence and significance of "John" for him. Although testimony established that L.R. had at times taken his medications while on outpatient treatment, it also showed that, in recent times, he had failed to remain on the medication.

In Dr. Leet's opinion, L.R. likely would endanger himself and others if he acted on the command hallucinations and paranoid delusions. He had in fact already frightened his family members to the point that he could not return to them. Although Dr. Leet had discussed the advantages and disadvantages of treatment with L.R., she concluded that he was incapable of making a decision regarding his treatment because of the influence of the command hallucinations. She did not believe that he would comply with outpatient treatment at that time. However, she did believe that, with further inpatient treatment, L.R. could try other medications and that one would be found to alleviate his illness so that he could be successful in outpatient treatment.

This evidence was sufficient to find that L.R. had a severe mental disorder that, if not treated, would cause him to continue to

suffer mental and emotional harm that would significantly impair his judgment, reason, behavior or capacity to recognize reality. It also was sufficient for the court to conclude that L.R. was incapable of understanding and accepting treatment alternatives.[7]

### III. CONCLUSION

The statute challenged is constitutional and the evidence established the three criteria necessary to find that L.R., a chronically mentally-ill person, is persistently or acutely disabled. Accordingly, we affirm the court's order.

TAYLOR, P.J., and GERBER, J., concur.

---

7. L.R. maintains that his right to privacy was violated when he was forced to accept medical treatment. The record does not support the claim that L.R. ever refused medical treatment while at ASH. His argument was that he was unwilling to continue psychiatric treatment there.