854 P.2d 1207

**In re Application for the COMMITMENT OF AN ALLEGED MENTALLY DIS-ORDERED PERSON MH 91-00558.**

**No. 1 CA–CV 91–0456.**

Court of Appeals of Arizona,
Division 1, Department D.

June 10, 1993.

Maricopa County Attorney's Office by Albert H. Gavit, Deputy County Atty., Phoenix, for appellee.

Maricopa County Public Defender's Office by Jodi M. Weisberg, Deputy Public Defender, Phoenix, for appellant.

## OPINION

TOCI, Presiding Judge.

W.C. appeals from the trial court's finding that she is acutely disabled and its order that she serve 365 days of combined inpatient and outpatient treatment. Arizona Revised Statutes Annotated ("A.R.S.") section 36–501(29)(b) provides that a person is persistently or acutely disabled if that person suffers from a mental disorder that:

Substantially impairs the person's capacity to make an informed decision regarding treatment and this impairment causes the person to be incapable of understanding and expressing an understanding of the advantages and disadvantages of accepting treatment and understanding and expressing an understanding of the alternatives to the particular treatment offered after the advantages, disadvantages and alternatives are explained to that person.

Because the record is devoid of substantial evidence that the physician explained to W.C. the advantages, disadvantages, and alternatives of her proposed treatment and that she was incapable of understanding such treatment options, we conclude that the trial court erred in finding that W.C. was acutely disabled. We, therefore, reverse and vacate the order for treatment.

### FACTUAL AND PROCEDURAL BACKGROUND

On May 30, 1991, W.C., a twenty-five-year old nursing assistant with a steady employment history and no prior psychiatric history, worked a night shift at the Kivel Care Center. That evening, instead of waiting by the time clocks as she usually did at the beginning of her shift, W.C. was seen by her supervisor, Joyce Henthorne ("Henthorne"), reading her Bible in the visitor's lounge. After Henthorne approached W.C. in the lounge and gave her instructions about what she should do when her shift began, W.C. left the premises.

The next morning, one of W.C.'s co-workers noticed W.C. walking around a neighborhood, located about one-half mile from Kivel in one direction and one-half mile from W.C.'s apartment in another direction. After the co-worker reported seeing W.C., Henthorne called the police. Although Henthorne did not know where W.C. lived, she reported to the police that W.C. "hadn't been home and that she had left work unexpectedly." Henthorne then made arrangements to meet a police officer at W.C.'s location.

Henthorne and Officer Cappellano ("Cappellano") located W.C. in the yard of a residence, seated on an irrigation structure, reading her Bible. Cappellano asked W.C. her name; W.C. responded and, at the same time, explained that she was fine. When Cappellano told W.C. that "some friends" were concerned about her having left work the night before and that she should go to the county hospital to see if she was okay, she refused and started walking away from them. As the conversation continued, W.C. became agitated; she repeatedly stated, "In the name of Jesus, I must die," and called Cappellano "Satan."

Although Henthorne eventually convinced W.C. to ride with her to the hospital, when they arrived W.C. refused to enter and began struggling with Cappellano. Cappellano and a hospital security guard then handcuffed W.C. and took her into the hospital. W.C. continued screaming, kicking, squirming, and calling those around her "Satan."

Cappellano completed an Application for Involuntary Evaluation, pursuant to A.R.S. section 36–520,[1] and, pursuant to A.R.S. section 36–524,[2] Henthorne completed an

---

1. A.R.S. § 36–520 states in relevant part:

   A. Any responsible individual may apply for a court-ordered evaluation of a person who is alleged to be, as a result of a mental disorder, a danger to self or to others, persistently or acutely disabled, or gravely disabled and who is unwilling or unable to undergo a voluntary evaluation. The application shall be made in the prescribed form and manner as promulgated by the deputy director.

2. A.R.S. section 36–524 states in relevant part:

   A. A written application for emergency admission shall be made to an evaluation agen-

*Application for Emergency Admission.* Based on these applications, a physician filed a Petition for Evaluation pursuant to A.R.S. section 36–523.[3] Later, a second physician evaluated W.C. and filed a Petition for Court–Ordered Treatment pursuant to A.R.S. section 36–533,[4] alleging that W.C. suffered from a mental disorder and was a "danger to self" or "persistently or acutely disabled and in need of treatment."

At W.C.'s hearing, both Henthorne and Cappellano testified as to the events leading up to W.C.'s admission to the hospital. In addition, two staff psychiatrists, who were part of the treatment-team that examined W.C., testified that she was a danger to herself and persistently or acutely disabled. Dr. Menendez, who was W.C.'s treating physician, stated that W.C. suffered from "bipolar disorder manic phase" and that she was in need of psychiatric care. He also stated that her disorder had "a chance of persisting for months," that it significantly impaired her judgment and reason, and that he had a substantial expectation that she would cause herself harm. He did not, however, consider W.C. to be suicidal.

On direct examination, the attorney for the medical center asked Dr. Menendez, "Were you able to have a meaningful discussion with [W.C.] about the advantages and disadvantages of psychiatric treatment?" Dr. Menendez responded, "Not really." On cross-examination the following exchange also took place:

Q. And you have not discussed with her the various advantages and disadvantages of the various options of treatment? Is that your testimony?

A. We discussed the recommendation that the treatment team was going to make.

Q. Right, but you didn't discuss other options or alternatives with her....

A. I saw no other options or alternatives.

Q. I see. So you only discussed with her what your recommendation would be?

A. That's right.

The second psychiatrist, Dr. Mulla, agreed with Dr. Menendez's opinion with one exception: he believed that W.C. was suicidal. Dr. Mulla based his belief on certain writings made by W.C. and her statements that she wanted to go to heaven and die for Jesus. Later, on cross-examination, Dr. Mulla testified as follows:

Q. Did you discuss with [W.C.] all the options and advantages and disadvantages of accepting treatment?

A. Yes. I did.

Q. And what options did you discuss with her other than the treatment team recommendation?

A. Uh—no I think—uh.

Q. Is that the only one you discussed with her?

A. Yes....

cy before a person may be hospitalized in the agency.

B. The application for emergency admission shall be made by a person with knowledge of the facts requiring emergency admission. The applicant may be a relative or friend of the person, a peace officer, the admitting officer or another responsible person.

3. A.R.S. § 36–523, provides in relevant part:
B. The petition shall request that the court issue an order requiring that the proposed patient be given an evaluation and shall advise the court of both of the following:
1. That the opinion of the petitioner is either that the proposed patient is or is not in such a condition that without immediate or continuing hospitalization he is likely to suffer serious physical harm or further deterioration or inflict serious physical harm upon another person.

2. If the opinion of the petitioner is that the proposed patient is not in the condition described in paragraph 1 of this subsection, that the opinion of the petitioner is either that the evaluation should or should not take place on an outpatient basis.

4. A.R.S. section 36–533, provides in relevant part:
A. The petition for court-ordered treatment shall allege:
1. That the patient is in need of a period of treatment because he is, as a result of mental disorder, a danger to self or to others, is persistently or acutely disabled or is gravely disabled.
2. The treatment alternatives which are appropriate or available.
3. That the patient is unwilling to accept or incapable of accepting treatment voluntarily.

Q. ... did you discuss with her any other options other than the treatment teams recommendation?

A. There are no other options.

Finally, both of W.C.'s adoptive parents testified. W.C.'s adoptive father, a professor in the field of American religious history, testified that W.C. was raised in a very religious environment and explained that in such an environment, statements like "I must die for Jesus" are commonplace. He also testified that before her adoption, W.C. had come from an extremely neglected background and that because of a considerable speech impediment, people often think "she is a little slow." W.C.'s father said that she had been "functioning very well," was self-supporting and able to take care of herself. W.C.'s mother testified that she saw W.C. when she was first hospitalized and again before the hearing and "she was fine." Finally, both parents stated they would help W.C. obtain voluntary treatment, if needed, and financially support such treatment.

The trial court concluded that the applicant did not establish by clear and convincing evidence that W.C. was a danger to herself. The court, however, found that clear and convincing evidence existed that W.C. was acutely disabled, and it ordered 365 days of combined inpatient and outpatient treatment. W.C. appealed in a timely manner. We have jurisdiction pursuant to A.R.S. section 36–546.01.

### DISCUSSION

### A. Standard of Review

■ If a court finds by clear and convincing evidence that a person is acutely disabled, it may order that person to undergo involuntary treatment. A.R.S. § 36–540; *see In re Pima County Mental Health*, 169 Ariz. 141, 142, 817 P.2d 945, 946 (App.1991). Acutely disabled means a severe mental disorder that meets *all* of the following criteria:

(a) If not treated has a substantial probability of causing the person to suffer or continue to suffer severe and abnormal mental, emotional or physical harm that significantly impairs judgment, reason, behavior or capacity to recognize reality.

(b) Substantially impairs the person's capacity to make an informed decision regarding treatment and this impairment causes the person to be incapable of understanding and expressing an understanding of the advantages and disadvantages of accepting treatment and understanding and expressing an understanding of the alternatives to the particular treatment offered after the advantages, disadvantages and alternatives are explained to that person.

(c) Has a reasonable prospect of being treatable by outpatient, inpatient or combined inpatient and outpatient treatment.

A.R.S. § 36–501(29). In reviewing the evidence, we will sustain the trial court's order if there is substantial evidence to support the trial court's conclusion. *In re Maxwell*, 146 Ariz. 27, 29, 703 P.2d 574, 576 (App.1985), *citing Juvenile Action No. JS–4130*, 132 Ariz. 486, 488, 647 P.2d 184, 186 (App.1982) (regardless of standard of proof that the trier of fact must apply, this court "can only review the evidence to determine if there is substantial evidence to support the conclusion of the trier of fact").

### B. The Evidence Does Not Satisfy the Statute

We hold that the trial court erred in finding that W.C. was acutely disabled. There is no evidence in the record to support the trial court's finding that W.C.'s disorder met the standard prescribed in subsection (b) of A.R.S. section 36–501(29). Because a finding of persistent or acute disability requires the existence of all the criteria in A.R.S. section 36–501(29), we need not discuss subsections (a) and (c) to conclude that the trial court's judgment should be reversed.

Unless the court finds, by clear and convincing evidence, that a person is a danger to self, a danger to others, is persistently or acutely disabled, or gravely disabled and in need of treatment, that person may reject treatment without consequence.

A.R.S. § 36–540(A).[5] Thus, under the statute and the requirements of the United States Constitution, a mentally ill person cannot be confined just because he or she is mentally ill. *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 2493–94, 45 L.Ed.2d 396 (1975) ("mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution ... [and m]ere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty").

■ Section 36–501(29)(b) focuses on the decision-making process of the mentally-ill individual. *In Re Maricopa County No. MH–90–00566*, 173 Ariz. 177, 840 P.2d 1042 (App.1992). Under the provisions of this section, a mentally ill person is not acutely disabled if such person can make an informed decision regarding treatment. The determination of whether a person is incapable of making an informed decision turns on the question of whether such person is incapable of understanding *and* expressing an understanding of the advantages and disadvantages of the treatment and the alternatives to the treatment *after* such matters are explained to the patient. In other words, two things are required as a predicate to determining whether a mentally-ill person is capable of engaging in a rational decision-making process: first, the doctors must explain the advantages and disadvantages of *accepting* treatment; and second, the doctors must explain the alternatives to such treatment and the advantages and disadvantages of such alternatives. Unless the doctors have explained these matters to the mentally-ill person, the applicant cannot establish that such person's capacity to make an informed decision is impaired.

■ Thus, we conclude that section 36–509(B) requires more than a physician's opinion that an individual suffers from a mental disorder that impairs that person's ability to make an informed decision about treatment. *See Maxwell*, 146 Ariz. at 29–30, 703 P.2d at 576–77 ("The trial court must insure that each of the statutory elements is satisfied, regardless of whether the mental health professionals only testify as to the ultimate issue"). Our conclusion is supported by the language of section 36–539(B). That section provides that the two physicians who performed the examination of the mentally-ill person shall testify at the hearing and "[s]uch testimony shall state *specifically* the nature and extent of the ... persistent or acute disability." (Emphasis supplied.) The rules of statutory construction require that we read section 36–539(B) with 36–501(29). *See State v. Sweet*, 143 Ariz. 266, 270, 693 P.2d 921, 925 (1985), *citing State ex rel. Larson v. Farley*, 106 Ariz. 119, 122, 471 P.2d 731, 734 (1970) (statutes which relate to same subject should be read and construed together, as though they constitute one law). Hence, we conclude that to prove by clear and convincing evidence that W.C. was acutely disabled, the applicant had to present, through the testimony of the physicians, sufficient factual details to comply with the requirements of section 36–501(29)(b).

■ Here, the testimony of the two physicians does not meet this standard. The record establishes that neither physician explained to W.C. the advantages and disadvantages of the alternatives to the offered treatment. Instead, both doctors testified that there "were no options." This testimony does not comply with subsection (b) of section 36–501(29) for two reasons. First, neither doctor specifically explained what treatment was offered to W.C. and

5. A.R.S. § 36–540(A) states:
   If the court finds by clear and convincing evidence that the proposed patient is, as a result of mental disorder, a danger to himself, is a danger to others or acutely disabled or gravely disabled and in need of treatment, and is either unwilling or unable to accept voluntary treatment, the court shall order him to undergo one of the following:
   1. Treatment in a program of outpatient treatment.
   2. Treatment in a program consisting of combined inpatient and outpatient treatment.
   3. Inpatient treatment in a mental health treatment agency. . . .

why they concluded that no treatment alternatives existed. Second, in the treatment of mental illness, as in most medical treatment, the option exists to refuse any treatment at all. In fact, Dr. Menendez testified on direct examination that, in the absence of treatment, W.C.'s disorder would persist "for months [a]nd the disability would get probably progressively worse." Unfortunately, neither physician met the requirements of the statute by testifying that they advised W.C. that the disadvantage of refusing treatment was a deterioration in her mental condition. If the physicians failed to provide W.C. with any information about the disadvantage of non-treatment, the applicant could not demonstrate by clear and convincing evidence that W.C. was incapable of understanding the disadvantage of this alternative.

■ Finally, we hold that a physician's opinion that the patient is incapable of understanding the explanations required by the statute does not satisfy the requirements of section 36–501(29)(b). In other words, the criteria in section 36–501(29)(b) are not met unless the physicians also relate the specific reasons why the patient is incapable of understanding and expressing an understanding of such explanations. Our recent decision in *MH–90–00566*, illustrates this point. There, a schizophrenic mental patient was having "command hallucinations." A treating psychiatrist testified that because the patient's "command hallucinations" influenced his decision-making capacity, he was unable to give informed consent or make a decision regarding his treatment. *Id.* 173 Ariz. at 180–81, 840 P.2d at 1045–46. This court concluded that such testimony was sufficient to support the trial court's determination that the patient was persistently or acutely disabled within the meaning of section 36–501(29)(b). *Id.* at 185, 840 P.2d at 1050. Here, on the other hand, the doctors never explained to the trial court why W.C.'s mental disorder interfered with or impaired her decision-making ability. Thus, unlike *MH–90–00566*, the applicants never satisfied the requirements of section 36–501(29)(b).

### CONCLUSION

Because the record does not establish any evidence, let alone substantial evidence, that satisfies the requirements of A.R.S. section 36–501(29)(b), we conclude that the trial court's finding of disability cannot stand. "Proceedings to adjudicate a person mentally incompetent must be conducted in strict compliance with the statutory requirements. Failure to do so renders the proceedings void." *Maxwell*, 146 Ariz. at 30, 703 P.2d at 577 (citation omitted). For the forgoing reasons, we reverse the trial court's judgment and vacate the order for treatment. Consequently, we need not address the other issues raised on appeal.

CLABORNE and GRANT, JJ., concur.