IN THE

# ARIZONA COURT OF APPEALS
## DIVISION TWO

---

IN RE PIMA COUNTY MENTAL HEALTH NO. MH20130801

No. 2 CA-MH 2014-0006
Filed April 24, 2015

---

Appeal from the Superior Court in Pima County
No. MH20130801
The Honorable Peter W. Hochuli, Judge Pro Tempore

**ORDER VACATED**

---

COUNSEL

Mental Health Defender's Office, Tucson
By Sarah Medley
*Counsel for Appellant*

Community Partnership of Southern Arizona, Tucson
By Ryan J. Thomsen
*Counsel for Appellee*

---

**OPINION**

Judge Howard authored the opinion of the Court, in which Presiding Judge Kelly and Judge Vásquez concurred.

---

H O W A R D, Judge:

¶1      Appellant S.A. challenges the trial court's signed minute entry granting a petition for continued court-ordered mental health treatment, filed by the Community Partnership of Southern Arizona (CPSA) pursuant to A.R.S. § 36-543(F).  He argues the trial

court's order should be vacated because the psychiatric examination performed by Dr. Robin Ross did not comply with statutory requirements for continuation of court-ordered treatment, as set forth in § 36-543(D) and (E), and because CPSA failed to establish, by clear and convincing evidence, that he has a "[p]ersistent or acute disability" as defined in A.R.S. § 36-501(31). For the following reasons, we vacate the court's order.

**Background**

¶2          The underlying facts are undisputed. At all times relevant to these proceedings, S.A. was incarcerated in the Pima County Adult Detention Center (PCADC). In October 2013, a PCADC employee applied for an involuntary evaluation of S.A. pursuant to A.R.S. § 36-520, alleging in the application that S.A. had not been taking care of his personal hygiene, had smeared feces on himself and the wall of his cell, had been in a physical altercation while in custody, and had exhibited other aggressive and threatening behavior necessitating his removal from the PCADC general population. The applicant further alleged that S.A. had been uncooperative with PCADC staff, was in denial about his mental health problems, refused to speak with PCADC clinicians, and refused medications.

¶3          The trial court ordered an evaluation, and two PCADC psychiatrists reported that S.A. had refused to take prescribed psychiatric medication and had been uncooperative when they attempted to evaluate him, telling one of the psychiatrists, "I refuse to talk with you due to the crimes committed against me." The chief psychiatrist for PCADC filed a petition for court-ordered treatment pursuant to A.R.S. §§ 36-531(B), 36-533. Appointed counsel moved for a hearing on the petition, but S.A. refused to participate.

¶4          After finding S.A. had knowingly, voluntarily, and intelligently waived his presence, the court proceeded in S.A.'s absence. The court then granted the petition, finding S.A. was, as a result of a mental disorder, persistently or acutely disabled, a danger to others, and in need of psychiatric treatment. The court entered an order authorizing his involuntary mental health treatment, effective for one year.

**¶5**        Pursuant to the trial court's order, S.A. was enrolled for services with CPSA and assigned to Cope Community Services (COPE), an outpatient provider, even though he remained incarcerated.[1] In September 2014, Ross, COPE's medical director, conducted an annual review, as required by § 36-543(D), "to determine whether the continuation of [S.A.'s] court-ordered treatment [was] appropriate." Pursuant to the same statute, she then appointed herself "to carry out a psychiatric examination of [S.A.]." *Id.* In accordance with § 36-543(F), the results of her psychiatric examination were filed with CPSA's petition seeking continuation of S.A.'s court-ordered treatment.

**¶6**        In the report of her psychiatric examination, Ross wrote that, because S.A. had "been incarcerated since the time of his court ordered treatment," all of his "appointments" had been "completed by chart review and reports by the jail psychiatrist," and he had "never been seen by a C[OPE] psychiatrist." She thus explained that S.A.'s "rollover appointment" "was completed per chart review due to [his] being incarcerated." Ross opined that S.A. remained persistently or acutely disabled and in need of court-ordered treatment because he "ha[d] a history of not taking his prescribed psychiatric medications when he is not ordered by the courts to do so." She also concluded he lacked insight into his mental illness because "he wants off of all of his medications."

**¶7**        At the hearing that followed, S.A., through counsel, moved to dismiss the petition, arguing Ross's psychiatric examination was legally insufficient under § 36-543(D) and (E) because she had never had personal contact with S.A. or an

---

[1]In its answering brief, CPSA describes itself as the "Regional Behavioral Health Authority for Pima County," under contract with the Arizona Department of Health Services "to administer the publicly-funded behavioral health care system in Pima County." It further explains that COPE "is a Comprehensive Service Provider (CSP) under contract with CPSA to provide services to CPSA-enrolled members" like S.A., and that "CPSA provides legal representation to its CSPs such as COPE" in matters related to CPSA members who are receiving court-ordered treatment.

opportunity to talk with him about his medication or to ask whether he would agree to voluntary treatment. The trial court denied the motion and received testimony on the petition from Ross and S.A.

¶8            Ross explained that "all information" she has about S.A.'s mental health treatment at PCADC "is [obtained] through" progress notes prepared by a COPE court liaison, whose notes, in turn, are derived from "talking directly to [S.A.] and from talking to the clinical staff at the jail." Based on the court liaison's notes, Ross said S.A. had "maintained well" on a long-acting, injectable, anti-psychotic medication he receives every two weeks. She also stated that, although the first injection was administered forcibly, S.A. had since submitted to the injections. According to Ross, PCADC clinical staff told COPE's court liaison that S.A. had "been willing to take his injection" but "does not want to take the medication and has limited insight into [his] mental illness." But Ross could not answer whether PCADC clinical staff otherwise had been having difficulty engaging S.A. in treatment, because she had "not read anything about" that issue in the court liaison's progress notes.

¶9            When asked the basis for her recommendation that court-ordered treatment be continued, Ross stated that "what was most notable" was S.A.'s "presentation prior to starting medication." She said she did not know his diagnosis, but he was "being treated . . . for a psychotic disorder . . . [for] symptoms that are consistent with psychosis [and] that cleared upon using an antipsychotic." She testified there was a "substantial probability" S.A. would "suffer severe and abnormal mental or physical or emotional harm" without treatment, noting that he had "display[ed] . . . pretty significant psychotic symptoms" before treatment began.

¶10            S.A. testified that he believed his pre-treatment behavior had been caused by his "trying to get comfortable with [his] environment" at PCADC. He stated, "I was angry and I was scared so I was lashing out at some point." He said the medication had caused him "[d]ozens of side effects like cold sweats, the shakes, lack of sleep, [and] lack of motivation." He confirmed that he does not believe he has a mental illness; that he has consistently said, since involuntary treatment was ordered, that he did not want to

take the prescribed medications; that he was submitting to the injections because of the court's order; and that, if the trial court did not order continued, involuntary treatment, he would stop taking the medication.

¶11     At the close of the hearing, the trial court granted CPSA's petition, finding, by clear and convincing evidence, that S.A. "remain[ed], as a result of a mental disorder persistently or acutely disabled and in need of further court-ordered mental health treatment." The court further found that, although S.A. "at times may be able and willing to comply with treatment on a voluntar[y] basis, there are clearly periodic episodes wherein [he] is unable or unwilling to comply with treatment on a voluntar[y] basis." This appeal followed.

**Discussion**

¶12     S.A. first argues the trial court erred in denying his motion to dismiss the petition for continued treatment prior to the hearing. He asserts that CPSA had failed to comply with § 36-543(D) and (E) and that those provisions "require a face-to-face examination by the appointed psychiatrist." In the alternative, he argues the court erred in finding clear and convincing evidence that the advantages, disadvantages, and alternatives to treatment had been explained to him, as required to support a determination that he remained "persistently or acutely disabled."

¶13     "Because a person's involuntary commitment 'may result in a serious deprivation of liberty,' strict compliance with the applicable statutes is required." *In re Pima Cnty. Mental Health No. MH-2010-0047*, 228 Ariz. 94, ¶ 7, 263 P.3d 643, 645 (App. 2011), *quoting In re Coconino Cnty. Mental Health No. MH 1425*, 181 Ariz. 290, 293, 889 P.2d 1088, 1091 (1995). When statutory requirements are not strictly met, we are required to vacate an involuntary treatment order. *In re Pinal Cnty. Mental Health No. MH-201000076*, 226 Ariz. 131, ¶ 5, 244 P.3d 568, 569 (App. 2010). We address S.A.'s arguments in turn.

**Motion to Dismiss**

¶14 On appeal, we will review "any intermediate orders involving the merits of the action." A.R.S. § 12-2102(A). Accordingly, "[a]ppeal after entry of judgment typically is the proper method to challenge the denial of a motion to dismiss." *Sanchez v. Coxon*, 175 Ariz. 93, 94, 854 P.2d 126, 127 (1993); *see Pima Cnty. No. MH-2010-0047*, 228 Ariz. 94, ¶¶ 5, 7, 263 P.3d at 644-45 (reviewing denial of motion to dismiss on appeal after final judgment). "Although we generally review [a] trial court's denial of a motion to dismiss for an abuse of discretion," we review de novo an issue of statutory interpretation. *Edonna v. Heckman*, 227 Ariz. 108, ¶ 8, 253 P.3d 627, 628 (App. 2011).

¶15 A trial court may order involuntary mental health treatment only upon finding, by clear and convincing evidence, "that the proposed patient, as a result of mental disorder, is a danger to self, is a danger to others, has a persistent or acute disability or a grave disability and [is] in need of treatment, and is either unwilling or unable to accept voluntary treatment." A.R.S. § 36-540(A). When a court orders involuntary mental health treatment through an "outpatient" program, as the court did here in October 2013, the duration of the order "shall not exceed three hundred sixty-five days." § 36-540(D); *see also* A.R.S. § 36-542(A) (patient in court-ordered treatment discharged at expiration of order unless patent accepts treatment voluntarily or "new petition is filed").

¶16 Pursuant to § 36-543(D), within ninety days before a treatment order expires, the medical director of the supervising treatment agency "shall conduct an annual review . . . to determine whether the continuation of court-ordered treatment is appropriate." If, after annual review of "the mental health treatment and clinical records contained in the patient's treatment file," the medical director believes continuation of court-ordered treatment is appropriate, he or she "shall appoint one or more psychiatrists to carry out a psychiatric examination of the patient." *Id.*

¶17 A psychiatrist appointed to participate in such an examination "must consider, along with all other evidence, the patient's history before and during the current period of court-ordered treatment, the patient's compliance with recommended

treatment[,] and any other evidence relevant to the patient's ability and willingness to follow recommended treatment with or without a court order." § 36-543(E). An examining psychiatrist must then provide, in a report to the medical director, "opinions as to whether the patient continues to have a grave disability or a persistent or acute disability as the result of a mental disorder" and is "in need of continued court-ordered treatment." *Id.*

**¶18** After completion of this process, the medical director may file an application for continued court-ordered treatment "and shall file simultaneously with the application any psychiatric examination conducted as part of the annual review." § 36-543(F). If a hearing is requested, the applicant must prove, by clear and convincing evidence, (1) "[t]he patient continues to have a mental disorder and, as a result of that disorder, has either a persistent or acute disability or a grave disability"; (2) "[t]he patient is in need of continued court-ordered treatment"; and (3) "[t]he patient is either unwilling or unable to accept treatment voluntarily." § 36-543(H).

**¶19** In large part, the parties dispute the meaning of the "psychiatric examination" required to support a petition for continued court-ordered treatment. S.A. maintains this provision "means an examination of the person, not of his record," and he argues the petition should have been dismissed because Ross, acting as an appointed examining psychiatrist under § 36-543(D), failed to comply with this statutory requirement.

**¶20** Without addressing S.A.'s argument that the statute's reference to "examination of the patient" requires a psychiatrist to observe or communicate with the patient, CPSA contrasts the provisions of § 36-543(D) and (E), which it argues do not "provide or suggest that personal observations are a necessary component of a psychiatric examination" for purposes of continued treatment, with A.R.S. § 36-539(B), which requires that a hearing on an original petition for treatment must include testimony regarding the evaluating physicians' personal observations. According to CPSA, "The Arizona legislature knew how to require a psychiatric examination to include personal observations . . . but chose not to" and, therefore, § 36-543 "clearly and unambiguously does not require a psychiatric examination to be based on personal

observations."  CPSA also points out that, in 2012, the legislature "amended [title 36, chapter 5] to clarify the evaluation and examination requirements for purposes of Court-Ordered Treatment," and, in doing so, "removed the definition of 'examination' from § 36-501."  *See* 2012 Ariz. Sess. Laws, ch. 334, § 1.

**¶21**     We agree with CPSA that some of the recent amendments to title 36, chapter 5, were intended to clarify that a psychiatrist's opinions regarding initial court-ordered treatment could be based on "remote observations by interactive audiovisual media," § 36-501(12), in response to this court's determination that such observations were insufficient to meet the statute's previous requirement that physicians "personally conduct a physical examination of [the] patient," *In re Pinal Cnty. Mental Health No. MH-201000029*, 225 Ariz. 500, ¶ 21, 240 P.3d 1262, 1268 (App. 2010). But in contemporaneous amendments, the legislature also substantially revised the procedure to be followed to continue court-ordered treatment for patients initially found to be suffering from a persistent or acute disability.

**¶22**     Before 2005, § 36-543 only addressed continued court-ordered treatment for those patients initially found to have a grave disability.  *See* 1999 Ariz. Sess. Laws, ch. 83, § 11.  The statute was then amended to provide for continued involuntary treatment of a patient initially found to be persistently or acutely disabled, but only after "the medical director of the mental health treatment agency determine[d] that the patient has been substantially noncompliant with treatment during the period of the court order" and "an annual examination and review" was conducted, with a psychiatrist appointed "to carry out the examination."  2005 Ariz. Sess. Laws, ch. 291, § 2.

**¶23**     In 2011, the legislature amended this provision, striking "examination" from the statute and requiring only that an appointed psychiatrist conduct "an annual review."  2011 Ariz. Sess. Laws, ch. 19, § 4; *see also* Senate Fact Sheet, H.B. 2635, 50th Leg., 1st Reg. Sess. (Ariz. Apr. 8, 2011) (stating revision "[e]liminate[d] the requirement to conduct a physical examination of a patient as a component of the annual review of . . . court-ordered treatment").

**¶24** But in 2012, the legislature enacted more substantial changes to § 36-543, as reflected in the current statute. It eliminated the requirement that a patient be found substantially non-compliant with treatment before the court order could be continued, but it required the medical director, within newly specified time frames, to personally "review" treatment records and, if that review suggested continued court-ordered treatment was appropriate, to appoint a psychiatrist to "carry out a psychiatric examination of the patient." 2012 Ariz. Sess. Laws, ch. 334, § 6. Thus, having eliminated the requirement for a psychiatric examination in 2011, the legislature reinstated it in 2012. In light of the legislature's recent distinction between "review" and "examination," *see id.*; 2011 Ariz. Sess. Laws, ch. 219, § 4, we cannot conclude it intended the two terms to be synonymous, as CPSA seems to suggest.

**¶25** We agree with S.A. that the legislature contemplated a two-step process that has not occurred here. Ross, as medical director, reviewed the treatment records and concluded additional treatment was necessary. But there was no evidence anyone performed an additional "psychiatric examination," which presumably would have provided firsthand information on S.A.'s current condition.[2]

**¶26** "Generally, we will vacate a treatment order absent strict compliance with the applicable statutory provisions." *Pima*

---

[2] We find persuasive S.A.'s argument that a "psychiatric examination of the patient" must, at a minimum, include a psychiatrist's observations of him. *See In re MH 2008-000438*, 220 Ariz. 277, ¶ 14 & n.3, 205 P.3d 1124, 1127 & n.3 (App. 2009) ("[A] psychiatric examination . . . includes observing the patient's demeanor and physical presentation, and can aid in diagnosis."). But because the facts here do not support a conclusion that any examination was conducted after the medical director's initial review of records, we need not determine the scope of the examination required by § 36-543(E). S.A. does not argue that Ross was prohibited from appointing herself as an examining psychiatrist pursuant to § 36-543(D), and we do not consider the issue.

*Cnty. No. MH-2010-0047*, 228 Ariz. 94, ¶ 7, 263 P.3d at 645. We conclude we must do so here.

**Evidence of Persistent or Acute Disability**

**¶27**　　　　Although CPSA's failure to strictly comply with § 36-543 requires us to vacate the trial court's order for continued treatment, we address S.A.'s second argument because of the importance of the liberty interests at stake and because "the merits of this issue potentially evade our review." *Coconino Cnty. No. 1425*, 181 Ariz. at 292, 889 P.2d at 1090 (notwithstanding mootness, considering "significant" involuntary treatment procedural issue that may evade review due to "statutory time limits on commitment orders and the delays inherent in the appellate process"); *see also In re Maricopa Cnty. Mental Health No. MH 90-00566*, 173 Ariz. 177, 180, 840 P.2d 1042, 1045 (App. 1992) (noting "involuntary commitment order affects important liberty interest" in deciding to address moot issue that may evade review). "We view the facts in the light most favorable to sustaining the trial court's judgment," *In re MH 2008-001188*, 221 Ariz. 177, ¶ 14, 211 P.3d 1161, 1163 (App. 2009), and we will not reverse an involuntary treatment order for insufficient evidence "unless it is 'clearly erroneous or unsupported by any credible evidence,'" *In re MH 2008-000438*, 220 Ariz. 277, ¶ 6, 205 P.3d 1124, 1125 (App. 2009), *quoting In re Maricopa Cnty. Mental Health Case No. MH 94-00592*, 182 Ariz. 440, 443, 897 P.2d 742, 745 (App. 1995). However, we review de novo the application and interpretation of statutes involving involuntary mental health treatment. *Id.*

**¶28**　　　　To prevail on its petition to renew court-ordered treatment, CPSA was required to prove, by clear and convincing evidence, that S.A. "continues to have a mental disorder and, as a result of that disorder, has . . . a persistent or acute disability." § 36-543(H). And, to establish S.A. has a persistent or acute disability, CPSA was required to prove, inter alia, that he has

> a severe mental disorder that . . . causes [him] to be incapable of understanding and expressing an understanding of the advantages and disadvantages of accepting

> treatment and understanding and expressing an understanding of the alternatives to the particular treatment offered after the advantages, disadvantages and alternatives are explained to [him].

§ 36-501(31)(b).

**¶29**      Construing this statutory language, we held that "as a predicate to [the court] determining whether a mentally-ill person is capable of engaging in a rational decision-making process" concerning treatment, "the doctors must explain the advantages and disadvantages of accepting treatment[] and . . . the alternatives to such treatment and the advantages and disadvantages of such alternatives." *In re Maricopa Cnty. Mental Health No. MH 91-00558*, 175 Ariz. 221, 225, 854 P.2d 1207, 1211 (App. 1993). "Unless the doctors have explained these matters to the mentally-ill person, the applicant cannot establish that such person's capacity to make an informed decision is impaired." *Id.*

**¶30**      We also have observed that this requirement may be excused upon "clear and convincing [evidence] that it was impracticable" to explain the advantages and disadvantages of treatment alternatives to the patient, such as when a patient engages in "excessive verbal abuse, physical abuse, repeatedly walking away when the physicians attempt to discuss the matters, or nonresponsiveness." *Maricopa Cnty. No. MH 94-00592*, 182 Ariz. at 446, 897 P.2d at 748. Thus, "we do not believe that mental health officials must engage in a confrontation with a mentally ill patient or have the patient physically restrained in order to fulfill the letter of the requirement." *In re Pima Cnty. Mental Health No. MH-1140-6-93*, 176 Ariz. 565, 567-68, 863 P.2d 284, 286-87 (App. 1993).

**¶31**      Before the initial order for treatment, S.A. refused to discuss treatment, as shown by a psychiatrist's detailed explanation that when he attempted to engage S.A. in such discussion, S.A. became increasingly agitated and eventually said, in a raised voice, "Please leave my cell front." But when Ross was asked about more recent attempts to engage S.A. about his treatment, she said that he had "been willing to take his injection[s]" and that "[t]he [PCADC]

clinical team would tell our liaison that there is a lack of insight into his psychosis and the need for treatment," but that "in terms of any other engagement [she] ha[d] not read anything about it." When asked whether S.A.'s mental illness substantially impaired his capacity to make an informed decision about treatment, Ross answered, "I would say yes it does[,] but again that is a bit of a stretch, based on what I've read in the chart." Similarly, when asked whether she believed S.A. was "capable of understanding and expressing an understanding of the advantages and disadvantages of treatment," she relied on his initial refusal of treatment in the fall of 2013, stating this was "[t]he only thing" she "really ha[d] to go on in the records."

¶32　　　　Although CPSA acknowledges that § 36-543 requires a petitioner to show the patient presently remains persistently or acutely disabled, it attempts to distinguish *Maricopa County No. MH 91-00558* on the basis that the physicians in that case had performed evaluations in support of an initial order for treatment pursuant to § 36-533(B), not examinations pursuant to § 36-543(B). It argues that, in contrast to those physicians, Ross "ha[d] the benefit of [a] year['s] worth of clinical records to aid in the decision-making process [and] . . . was able to form a reasoned opinion" about S.A.'s capacity to understand the advantages and disadvantages of treatment, after those matters had been explained to him, "without personally interviewing him."

¶33　　　　S.A. testified he did not think he had a mental disorder and was only taking the medications because of the court order. But there was no evidence that anyone had attempted to engage him about the advantages and disadvantages of treatment after his court-ordered treatment began in the fall of 2013, and no evidence that S.A. had ever resisted such discussion.

¶34　　　　Section 36-501(31)(b) requires more than evidence that a patient wishes to decline treatment, *see Maricopa Cnty. No. MH-90-00566*, 173 Ariz. at 184, 840 P.2d at 1049, and it "requires more than a physician's opinion that [he] suffers from a mental disorder that impairs [his] ability to make an informed decision about treatment," *Maricopa Cnty. No. MH 91-00558*, 175 Ariz. at 225, 854 P.2d at 1211. The statute "focuses on the mentally-ill

individual's decision-making process rather than on the content of the decision," and, pursuant to the statute, that process may be found inadequate only after the advantages, disadvantages, and alternatives to treatment have been explained. *Maricopa Cnty. No. MH-90-00566*, 173 Ariz. at 184, 840 P.2d at 1049; *see also In re Maricopa Cnty. Mental Health No. MH 2007-001236*, 220 Ariz. 160, ¶ 29, 204 P.3d 418, 427 (App. 2008) (to support involuntary treatment order, physician's opinion must be "expressed to a reasonable degree of medical certainty").

**¶35** This court has recognized that "many patients who respond favorably to treatment need not be subjected to continued court-ordered treatment." *Maricopa Cnty. No. MH 94-00592*, 182 Ariz. at 445, 897 P.2d at 747. In this case, Ross acknowledged that S.A.'s psychotic symptoms had "cleared" after his treatment began and testified that "[u]sually insight is progressive and the length of time someone is stable the more insight they gain." Before an order for treatment may be extended beyond its original term, a petitioner must present evidence of some recent testing of a patient's incapacity "to make an informed decision regarding treatment . . . after the advantages, disadvantages and alternatives are explained." § 36-501(31)(b). Although PCADC clinical staff may have engaged S.A. in discussions about his treatment, there is no evidence in the record that such an exchange occurred, and CPSA therefore failed to prove, by clear and convincing evidence, that S.A. remained persistently and acutely disabled.

## Disposition

**¶36** For the foregoing reasons, we vacate the trial court's order continuing S.A.'s involuntary mental health treatment pursuant to § 36-543.