IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

––––––––––––––––––––––––––––

IN RE PINAL COUNTY MENTAL HEALTH NO. MH202400075

No. 2 CA-MH 2024-0007
Filed November 26, 2024

––––––––––––––––––––––––––––

Appeal from the Superior Court in Pinal County
No. MH202400075
The Honorable Daniel Thorup, Judge Pro Tempore

**VACATED**

––––––––––––––––––––––––––––

COUNSEL

Kate Milewski, Pinal County Public Defender
By Kevin D. Heade, Deputy Public Defender, Florence
*Counsel for Appellant*

Kent P. Volkmer, Pinal County Attorney
By Anne Froedge, Deputy County Attorney, Florence
*Counsel for Appellee*

---

**OPINION**

---

Judge Vásquez authored the opinion of the Court, in which Presiding Judge O'Neil and Judge Kelly concurred.

---

V Á S Q U E Z, Judge:

**¶1** J.R. appeals from the trial court's April 2024 order for involuntary treatment. He challenges the sufficiency of the evidence to support the court's finding that he was a danger to self. He also argues the involuntary treatment order must be vacated because the evaluating physicians never discussed treatment alternatives with him. Relatedly, he contends the court failed to consider all available treatment alternatives and erred by not imposing the least restrictive one. For the following reasons, we vacate the involuntary treatment order.[1]

**Factual and Procedural Background**

**¶2** We view the facts in the light most favorable to sustaining the trial court's order. *In re Maricopa Cnty. Mental Health No. MH 2008-001188*, 221 Ariz. 177, ¶ 14 (App. 2009). Thirty-seven-year-old J.R.—who lives with his mother and his friend S.M.—suffers from epilepsy, attention-deficit hyperactivity disorder, and anxiety, and he sees a psychiatrist on an outpatient basis. In March 2024, J.R. got upset and jumped out of the passenger seat of his mother's car while she was traveling about five miles per hour in a parking lot.

**¶3** About a week later, J.R. became concerned that his chickens were dying due to having an extra pleural sac. He watched an online video about removing the sac and then began performing that procedure on his more than thirty chickens. While doing so, J.R. grew angry, and his mother saw him throw a bird against a cement wall. He then picked up a shovel and began banging it against the ground while continuing to yell and

---

[1]This appeal is arguably moot because the ninety-day involuntary treatment order expired in July 2024. However, given J.R.'s interests at stake as a result of having a commitment order in his record, we decide the appeal. *See In re Maricopa Cnty. Mental Health No. MH 2007-001236*, 220 Ariz. 160, n.3 (App. 2008).

scream. J.R.'s mother called 9-1-1. J.R. was taken to a hospital, where he was given medication to calm him down. A crisis interventionist with the hospital filed an application for involuntary evaluation, which the trial court ordered.

¶4 J.R. was transferred to Community Bridges, Inc. (CBI), where Dr. John Lee and Dr. Safdar Chaudhary each evaluated him. Both doctors concluded that J.R. was a danger to self, a danger to others, and persistently or acutely disabled (PAD) and was in need of treatment. Dr. Lee diagnosed J.R. with unspecified bipolar and related disorder, while Dr. Chaudhary diagnosed him with schizophrenia.

¶5 Following the evaluations, Dr. Lee filed a petition for court-ordered treatment, requesting combined inpatient and outpatient treatment for J.R. At a hearing on the petition, both doctors—as well as the crisis interventionist who had met with J.R. at the hospital, a behavioral health technician at CBI, J.R.'s mother, and S.M.—testified in support of the petition. J.R. testified on his own behalf.

¶6 At the end of the hearing, the trial court concluded the evidence was insufficient to establish that J.R. was a danger to others or PAD. However, the court found by clear and convincing evidence that he was a danger to self. The court based its finding on J.R.'s act of getting out of a moving vehicle. The court explained: "[E]ven if it is going five miles per hour, that is dangerous behavior and one a normal person would[] not engage in." The court thus ordered a program of "combined inpatient and outpatient treatment . . . for a period of time not to exceed a total of 365 days, with the period of inpatient treatment under this combined order not to exceed [90] days." This appeal followed.

## Sufficiency of the Evidence

¶7 J.R. contends there was insufficient evidence to establish he was a danger to self. He maintains the trial court "relied on a single act"—"exiting a car moving at or below the speed of people walking around it in a parking lot"—to conclude he was. But, he argues, "No evidence was offered establishing that exiting a moving vehicle at such a low speed could pose a risk of serious harm or death."[2] We will affirm an involuntary

---

[2] In support of his argument, J.R. relies on a magazine article to reason that if his behavior could be deemed to pose a serious physical harm, so too would a number of other activities, including skateboarding, skiing, running, and riding horses. However, he did not present this article below.

treatment order if it is supported by substantial evidence. *In re Maricopa Cnty. Mental Health No. MH 2007-001236*, 220 Ariz. 160, ¶ 15 (App. 2008). "Substantial evidence is evidence which would permit a reasonable person to reach the trial court's result." *In re Maricopa Cnty. Mental Health No. MH 2008-000097*, 221 Ariz. 73, ¶ 17 (App. 2009) (quoting *In re Estate of Pouser*, 193 Ariz. 574, ¶ 13 (1999)).

¶8        As relevant here, "danger to self" means:

> [B]ehavior that, as a result of a mental disorder:
>
> (i)      Constitutes a danger of inflicting serious physical harm on oneself, including attempted suicide or the serious threat thereof, if the threat is such that, when considered in the light of its context and in light of the individual's previous acts, it is substantially supportive of an expectation that the threat will be carried out.
>
> (ii)     Without hospitalization will result in serious physical harm or serious illness to the person.

A.R.S. § 36-501(9)(a).[3] "Danger to self" covers "irrational, risky behavior such as compulsively wandering into heavy traffic." *In re Pima Cnty. Mental Health No. MH-674-5-88*, 159 Ariz. 547, 548 (App. 1988); *see also Pima County v. Kaplan*, 124 Ariz. 510, 512 (App. 1980) (patient was "danger to self" based on evidence he had been arrested for driving wrong way on freeway and found beneath jet preparing for takeoff). And the danger must be

---

*See State v. Schackart*, 190 Ariz. 238, 247 (1997) ("Because our court does not act as a fact-finder, we generally do not consider materials that are outside the record on appeal."); Ariz. R. Civ. App. P. 11(a) (record on appeal consists of documents filed in trial court).

[3]"Danger to self" does not include "behavior that establishes only the condition of having a grave disability." § 36-501(9)(b); *see also* § 36-501(16) ("'Grave disability' means a condition evidenced by behavior in which a person, as a result of a mental disorder, is likely to come to serious physical harm or serious illness because the person is unable to provide for the person's own basic physical needs.").

imminent. *See In re Pima Cnty. Mental Health No. MH1717-1-85*, 149 Ariz. 594, 596 (App. 1986) (imminence implicit in concepts of danger and expectation of harm).

¶9 Here, J.R. admitted to getting out of a slow-moving vehicle. His mother testified that he had done it "a couple of times," most recently when she was driving three to five miles per hour in a parking lot. The only other incident she described had occurred about nine months prior when they were "coming down the street" to their house, approaching the driveway and J.R. was upset. His mother stated, "If you start talking to [J.R.] in a car and you get on something that he doesn't want to hear about, it is like the escape." S.M. similarly testified that J.R. had jumped out of the car the most recent time because "he was just mad." By contrast, J.R. testified that he had jumped out of the car that time because he was "scared." He explained that his mother was not paying attention and there had been another vehicle backing up and a pedestrian walking close to the car. J.R. did not think his behavior was "unsafe" because "people were walking faster than the vehicle was moving."

¶10 As a preliminary matter, we agree with the trial court that getting out of a moving vehicle, even one going slowly, is a dangerous behavior. The record lacks direct evidence that J.R.'s behavior in doing so was the "result of a mental disorder." § 36-501(9)(a); *see also In re Maricopa Cnty. Mental Health No. MH 94-00592*, 182 Ariz. 440, 444 (App. 1995) (danger to self focuses on "behavioral impairments" resulting from mental disorder (emphasis omitted)). But Dr. Lee and Dr. Chaudhary both suggested that J.R.'s "impulsive" behavior was indicative of mental illness. Dr. Chaudhary, in particular, noted that J.R. "could not comprehend the danger he has caused to himself due to his impulsive behaviors by getting out of a moving vehicle." To the extent such evidence conflicts with the testimony that J.R. got out of the car because he was upset or scared, it was for the trial court to resolve any such conflicts. *In re Pima Cnty. Mental Health No. MH-2010-0047*, 228 Ariz. 94, ¶ 17 (App. 2011). We will not reweigh the evidence on appeal. *Id.*

¶11 However, based on the undisputed evidence in this case that the vehicle was traveling three to five miles per hour, we cannot agree with the trial court that J.R. was a "danger to self" insofar as his behavior in getting out of the vehicle (i) "constitutes a danger of inflicting serious physical harm" to himself or (ii) "will result in serious physical harm or serious illness" to him without hospitalization. § 36-501(9)(a). Resolution of this issue requires us to interpret the meaning of "danger to self" in § 36-501(9)(a). *See In re Maricopa Cnty. Mental Health No. MH 2006-000749*,

214 Ariz. 318, ¶ 13 (App. 2007) (we review issues of statutory interpretation de novo). In doing so, we look to the language of the statute as the most reliable indicator of its meaning. *Maricopa Cnty. No. MH 2008-000097*, 221 Ariz. 73, ¶ 8. If that language is plain and unambiguous, we apply it as written without resorting to other methods of statutory interpretation. *In re Drummond*, ___ Ariz. ___, ¶ 5, 543 P.3d 1022, 1025 (2024). In the absence of statutory definitions, we give words their ordinary meaning and may rely on respected dictionary definitions. *Maricopa Cnty. No. MH 2008-000097*, 221 Ariz. 73, ¶ 8; *see also Drummond*, ___ Ariz. ___, ¶ 7, 543 P.3d 1022, 1025.

**¶12**      The mental-health statutes do not define "serious physical harm," as used in § 36-501(9)(a). Relying on the term's ordinary meaning, as well as dictionary definitions, we conclude "serious physical harm" means harm that poses a substantial risk of death, permanent disfigurement, or protracted impairment. *See Physical harm*, Black's Law Dictionary (12th ed. 2024) ("Any physical injury or impairment of . . . the human body."); *Injury*, Black's Law Dictionary (12th ed. 2024) ("physical injury" means "bodily injury," and "serious bodily injury" means "[s]erious physical impairment of the human body; esp., bodily injury that creates a substantial risk of death or that causes serious, permanent disfigurement or protracted loss or impairment of the function of any body part or organ"); *cf.* A.R.S. § 13-105(39) (in criminal statutes, "serious physical injury" means "physical injury that creates a reasonable risk of death, or that causes serious and permanent disfigurement, serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb"). And, as used in § 36-501(9)(a), "will result in" means serious physical harm or illness will necessarily occur in the future. *See Maricopa Cnty. No. MH 2008-000097*, 221 Ariz. 73, ¶ 8; *see also Result in*, Merriam-Webster, https://merriam-webster.com (last visited Sept. 30, 2024) ("to cause (something) to happen" or "to produce (something) as a result"); *Will*, Merriam-Webster, https://merriam-webster.com (last visited Sept. 30, 2024) ("used to express futurity" or "used to express inevitability").

**¶13**      Here, J.R. jumped out of a slow-moving vehicle twice, approximately nine months apart, and there was no evidence of any harm to J.R., let alone a substantial risk of death, permanent disfigurement, or protracted impairment. At least with regard to the most recent incident, there was evidence that people were walking faster than the vehicle was

moving. And there was no evidence of suicidal ideations by J.R.[4] *See In re Pima Cnty. Mental Health No. MH-1375-2-85*, 146 Ariz. 488, 489 (App. 1985) (patient's multiple suicide attempts and statements supported "danger to self" finding). J.R.'s behavior thus stands in stark contrast to other behaviors—such as walking into heavy traffic, driving the wrong way on the freeway, or laying beneath a jet preparing for takeoff—that this court has determined sufficient to constitute a danger to self. *See Pima Cnty. No. MH-674-5-88*, 159 Ariz. at 548; *Kaplan*, 124 Ariz. at 512.

**¶14** Notably, although both doctors indicated in their reports that J.R. was a danger to self, neither seemed particularly concerned with that conclusion at the hearing. When asked whether J.R. was a danger to himself, Dr. Lee testified that "it was more PAD than anything else." Dr. Chaudhary somewhat similarly testified that he was concerned "predominately [with] the safety of other[s]," not J.R.

**¶15** Although we defer to the trial court's ability to weigh the evidence, observe the parties, and judge the credibility of witnesses, *Pima Cnty. No. MH-2010-0047*, 228 Ariz. 94, ¶ 7, "the bare assertion that the statutory criterion was met, without any explication of the facts that show it was met, does not constitute clear and convincing evidence," *In re Maricopa Cnty. Mental Health No. MH2011-000914*, 229 Ariz. 312, ¶ 13 (App. 2012) (quoting *Maricopa Cnty. No. MH 94-00592*, 182 Ariz. at 447 n.4). On this record, the possibility that J.R.'s behavior might have resulted in serious physical harm was speculative. *See City of Tucson v. Citizens Utils. Water Co.*, 17 Ariz. App. 477, 481 (1972) (mere speculation not substantial evidence). Because there is insufficient evidence to establish J.R. met the statutory definition of being a danger to self, we vacate the involuntary treatment order.[5]

---

[4]At the hearing, J.R.'s mother testified that J.R. had "talk[ed] about using his gun" about nine months prior, but there was no follow-up or clarification of what this meant. And the trial court found "a lot of inconsistencies" in her testimony. *See Pima Cnty. No. MH-2010-0047*, 228 Ariz. 94, ¶ 17 (trial court determines witness credibility).

[5]Although we vacate the trial court's order for insufficient evidence, we nevertheless address J.R.'s remaining arguments because of the liberty interests at stake and because the issues would potentially evade our review. *See In re Pima Cnty. Mental Health No. MH20130801*, 237 Ariz. 152, ¶ 27 (App. 2015).

**Treatment Alternatives**

## I. The physician's discussion of the treatment alternatives

**¶16**        J.R. also argues that the trial court erred in ordering involuntary treatment because the statutory scheme, specifically A.R.S. § 36-533(A)(2), "requires evaluating physicians to discuss the alternatives to treatment, including the disadvantages and advantages of treatment alternatives with those individuals subject to a petition for court-ordered treatment." Because Dr. Lee and Dr. Chaudhary failed to discuss any alternatives with him, J.R. maintains that the order must be vacated.

**¶17**        Involuntary treatment proceedings may result in serious deprivations of a defendant's liberty interests. *In re Maricopa Cnty. Mental Health No. 2003-000058*, 207 Ariz. 224, ¶ 12 (App. 2004). We thus require "complete compliance" with the statutory scheme. *In re Pima Cnty. Mental Health No. 20200860221*, 255 Ariz. 519, ¶ 11 (2023) (explaining that compliance may be "technically different from what the statute requires"). Whether there has been sufficient compliance is a question of law we review de novo. *Pima Cnty. No. MH-2010-0047*, 228 Ariz. 94, ¶ 7. "But to the extent the trial court's decisions in this regard require it to assess the credibility of witnesses and weigh the relative strength of their testimony in order to reach fact-based conclusions, we defer to the court." *Id.*

**¶18**        Section 36-533(A) provides the requirements for a petition for court-ordered treatment. The petition must allege: (1) "[t]hat the patient is in need of a period of treatment because the patient, as a result of mental disorder, is a danger to self or to others or has a persistent or acute disability or a grave disability," (2) "[t]he treatment alternatives that are appropriate or available," and (3) "[t]hat the patient is unwilling to accept or incapable of accepting treatment voluntarily."

**¶19**        Contrary to J.R.'s argument, this statute does not require the physicians to discuss treatment alternatives with the patient. It merely requires that the alternatives be listed on the petition for court-ordered treatment. That requirement was met here. The petition listed three treatment alternatives—"court-ordered outpatient treatment," "court-ordered combined inpatient and outpatient treatment," and "court-ordered inpatient treatment"—with a checkbox next to each. Dr. Lee checked the second option for "court-ordered, combined inpatient and outpatient treatment."

**¶20**        J.R. nevertheless relies on *In re Pima County Mental Health No. MH20130801*, 237 Ariz. 152 (App. 2015). He argues that "[t]he purpose of

the requirement for evaluating physicians to discuss treatment alternatives with the person being evaluated is to provide a basis for the evaluator and the court to assess whether the patient has the ability to make an informed decision about treatment." But *Pima County No. MH20130801* is inapplicable here.

**¶21** In that case, we vacated the trial court's order continuing S.A.'s involuntary mental health treatment. *Pima Cnty. No. MH20130801*, 237 Ariz. 152, ¶ 36. We determined, in part, that the petitioner had failed to prove S.A. was PAD. *Id.* ¶ 35. Pointing to the definition of "persistent or acute disability," we explained that to establish S.A. was PAD, the petitioner was required to prove he had a severe mental disorder that "causes [him] to be incapable of understanding and expressing an understanding of the advantages and disadvantages of accepting treatment and understanding and expressing an understanding of the alternatives to the particular treatment offered after the advantages, disadvantages and alternatives are explained to [him]." *Id.* ¶ 28 (quoting A.R.S. § 36-501(31)(b)).[6] Thus, before the trial court could make a PAD finding, we observed that the doctors must explain to the patient "the advantages and disadvantages of accepting treatment[] and . . . the alternatives to such treatment and the advantages and disadvantages of such alternatives." *Id.* ¶ 29 (quoting *In re Alleged Mentally Disordered Person MH 91-00558*, 175 Ariz. 221, 225 (App. 1993)). We recognized a narrow exception for when it is impracticable, "such as when a patient engages in 'excessive verbal abuse, physical abuse, repeatedly walking away when the physicians attempt to discuss the matters, or nonresponsiveness.'" *Id.* ¶ 30 (quoting *Maricopa Cnty. No. MH 94-00592*, 182 Ariz. at 446). However, because no discussion occurred in that case, we concluded the petitioner had failed to establish S.A. remained PAD. *Id.* ¶ 35.

**¶22** Unlike *Pima County No. MH20130801*—and the cases on which it is based—this case does not involve a PAD finding. Although Dr. Lee and Dr. Chaudhary both opined that J.R. was PAD, the trial court rejected those opinions, instead finding that J.R. was a danger to self. As discussed above, to establish that a patient is a danger to self, the petitioner is required to show behavior that, as a result of a mental disorder, (i) constitutes a danger of inflicting serious physical harm on oneself or (ii) will result in serious physical harm or illness without hospitalization. § 36-501(9). Thus, a danger-to-self finding does not require the patient to

---

[6] Section 36-501 has since been amended, and the definition of persistent or acute disability is now located in subsection (33).

be incapable of understanding the advantages and disadvantages of treatment, which in turn does not require the doctors to discuss those advantages and disadvantages with the patient.

**¶23**        We recognize that § 36-533(A)(3) requires the petition to allege that "the patient is unwilling to accept or incapable of accepting treatment voluntarily." This seems to imply that the physician will have some sort of discussion with the patient about treatment—at least in cases where the patient is capable of accepting treatment. But we fail to see how the statute requires a granular discussion of "the disadvantages and advantages of treatment alternatives," as J.R. contends. Indeed, at oral argument, J.R. recognized that requiring physicians to discuss treatment alternatives with a PAD patient as opposed to a danger-to-self patient "makes sense" because of the severity of the behavior involved with a danger-to-self finding.

## II. The trial court's consideration of the treatment alternatives

**¶24**        In a related argument, J.R. contends the trial court "failed to consider alternatives and erred by not imposing the least intrusive treatment plan." He maintains the court "immediately sought out the most severe deprivation of liberty it could order by determining the longest period it could order in-patient treatment and did not even consider whether there should be limits on the use of psychotropic medication."

**¶25**        The trial court must "consider all available and appropriate alternatives for the treatment and care of the patient" and "shall order the least restrictive treatment alternative available." A.R.S. § 36-540(B). "'Least restrictive treatment alternative' means the treatment plan and setting that infringe in the least possible degree with the patient's right to liberty and that are consistent with providing needed treatment in a safe and humane manner." § 36-501(22).

**¶26**        Here, the trial court ordered a combination of inpatient and outpatient treatment, consistent with Dr. Lee's request on the petition. The order was consistent with the statutory scheme. The court ordered J.R. to receive treatment "for a period of time not to exceed a total of 365 days," with the inpatient treatment "not to exceed" ninety days, allowing for a shorter treatment period as appropriate. *See* § 36-540(D) (order to receive treatment shall not exceed 365 days), (F)(1) (maximum period of inpatient treatment is ninety days for person found to be danger to self).

**¶27**        J.R. nevertheless argues that the trial court committed fundamental error by subjecting him to forced psychotropic medication.

*See Pima Cnty. No. 20200860221*, 255 Ariz. 519, ¶ 20 (although we apply fundamental error review sparingly in civil cases, it is appropriate where patient's liberty interests at stake).  He maintains that, under § 36-540(B), "all available and appropriate alternatives for the treatment and care of the patient" includes a patient's medication regimen, which the court failed to consider in this case.  He further contends that Dr. Lee and Dr. Chaudhary "merely opined" that "inpatient treatment with the forcible use of psychotropic medication" was necessary without explaining why.  J.R. bases this argument on his right to privacy under article II, § 8 of the Arizona Constitution and the due process clause of the federal constitution.

**¶28**        The right to be free from the involuntary administration of psychotropic drugs is constitutionally protected.  *Rasmussen by Mitchell v. Fleming*, 154 Ariz. 207, 215 (1987) (right to refuse medical treatment protected by both state and federal constitutions); *see also Large v. Superior Court*, 148 Ariz. 229, 235-36 (1986) (federal constitution provides "benchmark of minimum constitutional protection").  However, that right may be infringed if the state "has legal reason to do so and when the procedures are proper."  *Large*, 148 Ariz. at 236; *see also Fleming*, 154 Ariz. at 216-17.  The question here is whether the trial court followed the proper procedures—a question that requires us to interpret § 36-540(B).  *See Pima Cnty. No. MH-2010-0047*, 228 Ariz. 94, ¶ 7.

**¶29**        When interpreting a statute, we must consider the context and read related statutes together to maintain harmony.  *In re Maricopa Cnty. Mental Health No. MH 2007-000937*, 218 Ariz. 517, ¶ 12 (App. 2008).  Here, reading the relevant statutes together shows that the "alternatives" the court must consider under § 36-540(B) are inpatient treatment, outpatient treatment, and combined inpatient and outpatient treatment, not the specifics of the treatment plan, including medication, as J.R. maintains.

**¶30**        Section 36-539(B)   requires   the   witnesses   at   an involuntary-treatment hearing to testify as to "placement alternatives appropriate and available for the care and treatment of the patient."  Using that evidence, § 36-540(B) then requires the trial court to consider "all available and appropriate alternatives for the treatment and care of the patient" and to order "the least restrictive treatment alternative available."  The mental-health statutes do not define "alternatives."  *See* § 36-501.  They do, however, define "least restrictive treatment alternative" as "the treatment plan and setting that infringe in the least possible degree with the patient's right to liberty."  § 36-501(22).  The statutes also do not define the terms "treatment plan" or "setting."  *See* § 36-501.  However, "outpatient treatment plan" is defined as a "treatment plan that does not require

continuous inpatient hospitalization," suggesting that "treatment plan" focuses on the environment in which treatment is administered and not the specific course of treatment.[7] *See* § 36-501(30). We also understand "setting" to carry its common meaning of place or location, like the mental-health agency providing a certain treatment plan. *See Setting*, Merriam-Webster, https://merriam-webster.com (last visited Nov. 13, 2024) ("the time, place, and circumstances in which something occurs or develops").

**¶31** Our conclusion that "alternatives" refers to inpatient treatment, outpatient treatment, or combined inpatient and outpatient treatment is further supported by the common meaning of "alternative." "Alternative" generally means "one of two or more things, courses, or propositions to be chosen." *Alternative*, Merriam-Webster, https://merriam-webster.com (last visited Nov. 14, 2024). Section 36-540(A) provides three "options"—a synonym for "alternatives"—for the trial court's order: inpatient treatment, outpatient treatment, and combined inpatient and outpatient treatment.

**¶32** We recognize that the contents of a given treatment plan will be more detailed, perhaps including medication recommendations. *See* § 36-540.01(B) (contents of outpatient treatment plan). But the plain language of § 36-540(B) does not require the trial court to consider those details when ordering treatment. *See Drummond*, ___ Ariz. ___, ¶ 5, 543 P.3d 1022, 1025. Instead, the statute requires the court to consider the placement "alternatives."[8] *See In re Maricopa Cnty. Mental Health No. MH 2006-000490*, 214 Ariz. 485, ¶ 12 (App. 2007) ("[W]e do not 'inflate, expand, stretch or extend a statute to matters not falling within its expressed provisions.'" (quoting *City of Phoenix v. Donofrio*, 99 Ariz. 130, 133 (1965))). We thus do

---

[7]This court granted the state's request to expand the record, to which J.R. did not object, to include his "Outpatient Treatment Plan." That plan makes no specific medication recommendations.

[8]J.R. further contends that the trial court failed to find that he was "unwilling or unable to accept voluntary treatment," as required by § 36-540(A). But the involuntary treatment order contains that finding. We do not construe the court's statement, "I don't know that [J.R.] can't make an informed decision," as negating that finding. An individual may simultaneously be unwilling to accept voluntary treatment and be capable of making informed decisions.

not agree with J.R. that the trial court erred by failing to consider the medication regimen when ordering treatment.

**¶33**   That said, we agree with J.R. that neither doctor testified as to any placement alternatives for J.R.  The trial court took judicial notice of the doctors' affidavits and reports, but those also did not meaningfully discuss the placement alternatives.  Dr. Lee recommended a combination of inpatient and outpatient treatment, but he did not explain why, stating only that J.R. "would benefit from medication stabilization and safety planning." Dr. Chaudhary generally noted, "It is considered appropriate to treat mental illness in inpatient and outpatient settings."  But he did not draw any specific conclusions or make recommendations as to this case.  There was also no discussion of treatment centers other than CBI.  Without such testimony or evidence, we fail to see how the trial court could have considered all available and appropriate treatment alternatives.  This further supports our decision to vacate the involuntary treatment order.  *See* § 36-540(B); *Pima Cnty. No. 20200860221*, 255 Ariz. 519, ¶ 11.

## Disposition

**¶34**   For the foregoing reasons, we vacate the trial court's order for involuntary treatment.