NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

IN RE: ANNA MARIE J.

No. 1 CA-MH 25-0071

FILED 11-04-2025

---

Appeal from the Superior Court in Coconino County
No.  S0300MH202500071
The Honorable Brent Davidson Harris, Judge Pro Tempore

**VACATED**

---

COUNSEL

Coconino County Attorney's Office, Flagstaff
By William P. Ring
*Counsel for Appellee The Guidance Center, Inc.*

Coconino County Legal Defender's Office, Flagstaff
By Jillian N. Marini
*Counsel for Appellant Anna Marie J.*

_____

**MEMORANDUM DECISION**

_____

Judge Veronika Fabian delivered the decision of the Court, in which Presiding Judge James B. Morse Jr. and Judge Anni Hill Foster joined.

_____

**F A B I A N**, Judge:

¶1        Anna Marie J. appeals an order for court-ordered treatment, arguing there was insufficient evidence to support the court's finding of a persistent or acute disability because the medical professionals at the treatment facility did not explain to her the advantages, disadvantages, and alternatives to treatment as required under A.R.S. § 36-501(33)(c) ("the consultation obligation"). Because neither the statutory requirement nor the impracticability exception to that requirement was met by clear and convincing evidence, the superior court's order is vacated. *See In re Pima Cnty. Mental Health No. MH20130801*, 237 Ariz. 152, 155 ¶ 13 (App. 2015).[1]

**FACTS AND PROCEDURAL HISTORY**

¶2        Anna's mother called the police after an altercation in which Anna "hit her mother in the arm very hard because her mother refused to do what she demanded." The police brought Anna to the crisis department of The Guidance Center ("TGC"). TGC is a mental health treatment facility in Flagstaff where medical professionals provide crisis management along with in-patient and out-patient psychiatric services. After TGC found Anna was not "competent for voluntary inpatient admission," it filed a petition for evaluation alleging she was a danger to herself and others. The court ordered an evaluation and found she required immediate or continued hospitalization prior to any hearing or court-ordered treatment.

¶3        TGC then filed a petition for court-ordered treatment of Anna pursuant to A.R.S. § 36-540(A), alleging she had a persistent or acute disability as defined by A.R.S. § 36-501(33). At the hearing on the petition,

_____

[1] Because this Court vacates the order for involuntary treatment based on insufficient evidence to support this statutory requirement, this Court does not address Anna's remaining arguments.

Anna's doctor and nurse practitioner at TGC testified as to their observations of Anna while she was on the unit.

¶4 The court found Anna was persistently or acutely disabled and ordered involuntary treatment. This Court has jurisdiction over Anna's timely appeal pursuant to A.R.S. §§ 36-546.01 and 12-120.21(A)(1).

## DISCUSSION

I. **This Court Reviews an Involuntary Treatment Order for Complete Compliance with Each Statutory Element.**

¶5 Court-ordered treatment "constitutes a significant deprivation of liberty that requires due process protection." *In re Jesse M.*, 217 Ariz. 74, 77 ¶ 14 (App. 2007) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)). The legislature has set forth a statutory scheme specifying adequate due process protections in A.R.S. §§ 36-532 through 544 ("the Statute"). *See In re MH 2007–001264,* 218 Ariz. 538, 539, ¶ 6 (App. 2008). Because of the due process interests at stake, "complete compliance," although not necessarily technical compliance, with the statute is required. *In re Pima Cnty. Mental Health No. 20200860221*, 255 Ariz. 519, 524 ¶¶ 10-11 (2023). This Court reviews an involuntary treatment order to determine if it is supported by substantial evidence. *In re MH 91-00558*, 175 Ariz. 221, 224 (App. 1993).

¶6 Under the Statute, for a superior court to order involuntary treatment, it must find by clear and convincing evidence:

> [T]hat the proposed patient, as a result of mental disorder, is a danger to self, is a danger to others or has a persistent or acute disability or a grave disability and is in need of treatment, and is either unwilling or unable to accept voluntary treatment.

A.R.S. § 36-540(A). Here, the court did not find Anna was a danger to herself or others. Instead, it found Anna suffered from a "persistent or acute disability," which the Statute defines as one that, among other things:

> Substantially impairs the person's capacity to make an informed decision regarding treatment, and this impairment causes the person to be incapable of understanding and expressing an understanding of the advantages and disadvantages of accepting treatment and understanding and expressing an understanding of the alternatives to the

particular treatment offered after the advantages, disadvantages and alternatives are explained to that person.

A.R.S. § 36-501(33)(c).

¶7        This Court explained this statutory requirement in *In re MH 91-00558*, 175 Ariz. 221, 225 (App. 1993), stating:

> [T]wo things are required as a predicate to determining whether a mentally-ill person is capable of engaging in a rational decision-making process: first, the doctors must explain the advantages and disadvantages of *accepting* treatment; and second, the doctors must explain the alternatives to such treatment and the advantages and disadvantages of such alternatives. **Unless the doctors have explained these matters to the mentally-ill person, the applicant cannot establish that such person's capacity to make an informed decision is impaired.**

(Second emphasis added).

¶8        To meet this statutory requirement, medical professionals must provide more than conclusory statements that a patient is incapable of making informed decisions regarding treatment. *In re MH2011-000914*, 229 Ariz. 312, 316 ¶ 14 (App. 2012). Furthermore, when medical professionals believe there are no alternatives to the proposed treatment plan, as is usually the case, they must explain the alternative of receiving no treatment. *MH 91-00558*, 175 Ariz at 226.

## II.     TGC Did Not Explain the Advantages, Disadvantages, and Alternatives to Treatment.

¶9        Anna asserts the court erred in finding she suffered from a persistent and acute disability because TGC did not explain to her the advantages, disadvantages, and alternatives to treatment. The court did not make a specific finding with respect to the consultation obligation, instead stating only that "[a]s a result of [a] mental disorder, the patient's capacity to make an informed decision regarding treatment is substantially impaired."

¶10       There is no dispute that TGC did not explain the advantages, disadvantages, and alternatives to treatment. Nor did TGC explain the alternatives of receiving no treatment to Anna. Instead, the medical professional testified they tried to explain the advantages, disadvantages,

and alternatives to treatment but Anna did not want to talk about them. Thus, this Court turns to whether the consultation obligation is excused here.

## III. TGC Did Not Meet the Standard for the Impracticability Exception.

¶11     Although no statutory exception to the consultation obligation exists, in *In re Pima County Mental Health No. MH-1140-6-93*, this Court held:

> [W]e do not believe that mental health officials must engage in a confrontation with a mentally ill patient or have the patient physically restrained in order to fulfill the letter of the requirement. This is particularly true where, as here, the record reflects a long history of mental illness, and the testimony of four witnesses establishes current behavior supporting the diagnosis of an acute and persistent disorder.

176 Ariz. 565, 568 (App. 1993). Thus, this Court found a departure from the express language of the Statute was appropriate because requiring a confrontation or restraints to meet the consultation obligation would be an absurd result. *Id.*

¶12     Subsequently, this Court held an exception to the consultation obligation could be shown "if the proof is clear and convincing that it was impracticable to [explain the advantages, disadvantages, and alternatives to treatment]." *In re MH 94-00592*, 182 Ariz. 440, 446 (App. 1995). This Court suggested the exception may sometimes be met where there is "excessive verbal abuse, physical abuse, repeatedly walking away when the physicians attempt to discuss the matters, or nonresponsiveness." *Id.* However, any such reaction by the patient must be "so extreme as to frustrate" the medical professionals' attempts. *Id.*

¶13     Although this Court has held that confrontation is not required under the impracticability exception, *see MH20130801*, 237 Ariz. at 158 ¶ 30, testimony that a person was vulgar and sarcastic for an "unstated duration and degree" and became "even like threatening" rather than actually threatening is not enough. *MH 94-00592*, 182 Ariz. at 446.

¶14     As this Court has stated, "[s]ome degree of resistance to treatment can be expected" in these types of cases. *Id.* If a patient does not become confrontational or walk away, a medical professional can still,

without undue burden, explain the advantages, disadvantages and alternatives to treatment.

¶15   In this case, the testimony was as follows:

Q: Okay. Thank you. Now regarding, regarding your conversations with her about treatments. I understand that it's your testimony that she does not wish to hear anything about potential treatment options, is that correct?

A: That's correct.

Q: Did you attempt to discuss with her the option of receiving no treatment?

A: Um, I couldn't get there, counsel…

Q: Okay.

A: … it's almost like a taboo talking. Anything that has to do with treatments is out of bounds.

Q: Sure. But this would have to do with not receiving treatments? Was that approached with her?

A: I did not have, she didn't give me an opportunity.

Q: Okay. Was that because you tried to leave the room when you met with her?

A: It goes to a different subject. The only option in her mind is no treatment and without an opportunity for me to explain what would happen, no treatment, she'd receive no treatment.

Q: Okay. So, she would move on to another subject but she wouldn't, for example, get aggressive?

A: No.

Q: Or try to leave the room?

A: No. She dismissed me when treatment…on a number of occasions but she hasn't tried to leave the room herself.

. . . .

Q: Doctor, you indicated that when discussing the pros and cons of treatment and her demeanor in response to your discussion there, she, I believe you said, dismissed me? Could you elaborate on that a little bit?

A: The…when I, if I said, so [Anna] demands to be discharged and if I said to [Anna], [Anna], unfortunately I'm not able to discharge you at this time. Then she'd say, okay, we're done. It's nothing, there's nothing for us to talk anymore and I don't want to talk to you anymore. So, I would be dismissed.

Q: Okay.

A: The next day I could come back, and we could talk again but for that time I would be dismissed.

¶16    Anna's nurse practitioner testified similarly:

A: But she did say that she didn't want to go any further when I wasn't going to discharge her that day and then she became upset at me and got a little bit angry and wanted to (inaudible) and said, (inaudible) so.

. . . .

Q: But given her current conditions based upon your examination, I want to ask you if you took the opportunity to explain advantages and disadvantages of treatment with her?

A: I did try. I have tried to. And I did again when I met with her last week. She is adamant that, that this is a religious experience that she's having and she does not need medication.

Q: So you attempted to explain those advantages and disadvantages?

A: I did, yes.

¶17    Thus, Anna did nothing that would have prevented TGC from complying with the consultation obligation. Although she may have told her medical professionals she didn't want them to explain to her the advantages and disadvantages of treatment or non-treatment, there is no

testimony Anna ever left the room, which would have made it impracticable to satisfy the consultation obligation. There was never evidence that she became verbally or physically abusive or made any threats. At most, she got a "little bit angry" when her nurse practitioner refused to discharge her. And although Anna did ask the doctor to leave when he refused to discharge her, he testified Anna was always willing to talk to him when he returned to speak to her the next day.

¶18        Under this record, this Court cannot say there was clear and convincing evidence that Anna's reaction was "so extreme as to frustrate" the medical professionals' attempts to comply with the consultation obligation. *MH 94-00592*, 182 Ariz. at 446. TGC presented no evidence to suggest it was impossible or impracticable to recite the advantages or disadvantages of treatment or no treatment, even if Anna was unwilling to really consider treatment. To hold otherwise, would expand the impracticability exception to the express statutory language further than necessary to prevent an absurd result.

¶19        Although TGC criticizes the necessity of "robotic gestures," it provides no real reason why medical professionals should not have to comply with such a minimal obligation specifically required by the Statute to ensure due process protections. *See Cnty. Att'y, Pima Cnty. v. Kaplan*, 124 Ariz. 510, 511 (App. 1980).

## IV.     This Court Will Not Expand the Exception to the Consultation Obligation as Requested by TGC.

¶20        TGC concedes that case law places "the burden . . . on the Petitioner and the test at trial and on appeal is an antagonistic and confrontational one." It argues this Court should expand the impracticability exception to include circumstances such as Anna's.

¶21        First, TGC argues "[a] literal reading of the predicate 'after' in §36-501(33)(c) is interfering with the purpose of the legislation and the greater meaning of the facts at issue." It maintains the consultation obligation should be satisfied based on "substantial evidence of efforts at consultation." But this is not what the Statute says. Nor does TGC show how a strict reading of "after" results in an absurdity beyond the exception already created by this Court. *See In re Maricopa Cnty. No. MH2003–000240*, 206 Ariz. 367, 369 ¶ 6 (App. 2003). This Court will not interfere with the exclusive domain of the legislature by amending its valid procedural safeguards. *See Shaw v. State*, 8 Ariz. App. 447, 452 (1968) ("The judiciary cannot sit as a super-legislature to determine the wisdom, the necessity, or

the inconvenience of a legislative enactment."). This is particularly true for legislative enactments protecting substantive rights like due process. *See State v. McCartney*, 251 Ariz. 478, 480 ¶ 10 (App. 2021).

¶22 Second, relying on *In re Pima County Mental Health No. 20200860221*, TGC argues the consultation obligation is excused here because strict compliance in the mental health context allows for "compliance [that] is technically different from what the statute requires." 255 Ariz. at 524 ¶ 11. However, that case is distinguishable because it involved technical, not substantive, noncompliance with the statute. Specifically, A.R.S. § 36-533(B) requires two physician affidavits containing specific information be submitted in support of a petition for court-ordered treatment. *Id.* at 524 ¶ 12. The Arizona Supreme Court held that boilerplate affidavits not including the specific information could nonetheless be adequate if they incorporated by reference extrinsic documents that included the required information. *Id.* at 526 ¶ 17. Therefore, there was complete, but not technical, compliance with the statute. Here, TGC is asking to avoid complete compliance with the consultation obligation.

¶23 Third, TGC argues this Court should adopt the standard set forth by the dissent in *In re MH 94-00592*, which it claims allows for an exception to the consultation obligation where literal compliance is not possible; "results in absurdity or impossibility;" or "is implausible, impractical, and therefore not necessary."

¶24 However, TGC misreads the dissent in *In re MH 94-00592*. Instead of adopting a different standard, the dissent disagreed with the majority's application of the impracticability standard because it believed "the patient's history and likelihood of harm befalling him or others," met the impracticability standard. *MH 94-00592*, 182 Ariz. at 448. The majority found that appellant did not meet the exception even though he displayed "aggressive, delusional, and unpredictable behavior such as setting fire to his mother's carpet, assaulting his mother, throwing a telephone at elderly people while in the hospital, hearing voices, and seeing demons." *Id.* at 442. The dissent disagreed, pointing to additional factors such as the patient's "long history of mental illness and his numerous involuntary hospitalizations" after "neglecting to take his medication and relaps[ing] into substance abuse" and "verbal abuse, threatening demeanor and nonresponsiveness." *Id.* 448.

¶25 Here, the record does not include behavior coming close to that considered by the dissent in *In re MH 94-00592*. Although Anna "has been in psychiatric treatment since 2018" and "had a distant hospitalization

at [TGC] approximately 18 years ago" for paranoid schizophrenia, she was "stable and compliant with treatment for many years" until she became medically noncompliant in November 2024. According to the testimony from the medical professionals, she never got anything more than "a little bit angry" when they tried to fulfill the consultation obligation. She did not prevent TGC from satisfying its consultation obligation.

¶26         Finally, TGC urges this Court to shift the burden onto Anna to show consultation was still practical "[w]here the patient exhibits recalcitrant agitation and worse" and suggests the requirement be excused here because physicians tried to explain treatment alternatives "but were willfully refused." As noted above, *supra* ¶ 21, such arguments are better left for the legislature.

## CONCLUSION

¶27         This Court must vacate an involuntary treatment order when statutory requirements are not met. *See MH20130801*, 237 Ariz. at 155 ¶ 13. Because, as discussed above, there was not clear and convincing evidence that TGC met the consultation obligation or met the impracticability exception to that statutory requirement, the order for involuntary commitment is vacated.

