NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO
V.M., J.M., M.M., E.M., and C.M.

No. 1 CA-JV 25-0070

FILED 03-30-2026

Appeal from the Superior Court in Maricopa County
No. JD42091
The Honorable Marischa Hope Gilla, Judge

**AFFIRMED**

COUNSEL

Robert Rosanelli, Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant Father*

Maricopa County Public Advocate's Office, Mesa
By Seth Draper
*Counsel for Appellant Mother*

Arizona Attorney General's Office, Phoenix
By Veronica F. Rios
*Counsel for Appellee Arizona Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge David B. Gass joined. Judge Andrew J. Becke concurred in part and dissented in part.

---

**B R O W N**, Judge:

**¶1** Alondra M. ("Mother") appeals the juvenile court's order terminating her parental rights as to her children V.M., J.M., M.M., E.M., and C.M. Marcos R. ("Father") appeals the juvenile court's termination of his parental rights as to C.M. For the following reasons, we affirm.

## DISCUSSION

**¶2** In 2022, Mother was living with her children V.M., J.M., M.M. and E.M. The Department of Child Safety ("DCS") received multiple reports concerning Mother's family that year, including an incident in May where the children were living in a vehicle without a functioning air conditioner after being kicked out of a family member's home. Two months later, DCS received a report that Mother shoplifted from a grocery store and was seen using drugs behind the store. Soon after this incident DCS contacted Mother, who admitted using methamphetamine while the children were in her care. DCS petitioned for dependency, and the juvenile court found the children dependent after the Mother pled no contest to the allegations of abuse and neglect. The court first placed the children with relatives, but after DCS received a report noting two of the children had bruises, all four were placed with a foster family.

**¶3** Throughout the dependency, Mother struggled to consistently engage in services for her substance abuse. She failed to take many of her scheduled drug tests from 2022 through 2025, and some tests she did take were positive, including at least 12 times in 2024. Though Mother was referred to substance abuse treatment providers several times, many of the referrals closed out for lack of engagement. In October 2023, Mother gave birth to C.M., who was born substance-exposed.[1] Mother admitted using methamphetamine only hours before his birth. After DCS

---

[1] Father is not the parent of any other child in this case except C.M.

filed a dependency petition, C.M. was removed from Mother's care and placed with his half-siblings in licensed foster care.

¶4        Father learned about C.M.'s birth the week after he was born, but at that time Father was in jail in California. Father was then transferred to a federal detention center in Arizona, and in November 2023, he was deported to Mexico and lived in Nogales until June of the following year. Mother relocated to Nogales to be with Father, and in February 2024 Father managed to communicate with DCS when Mother called DCS. According to Father, during that call DCS's case manager informed Father he needed to establish paternity in Mexico. Father later testified he could not take a paternity test in Mexico without C.M. being present. Except for the limited contact in February 2024, Father did not reach out to DCS or inquire whether there was any way for him to see or visit C.M. while he was in Mexico. DCS records similarly show that Father did not respond to DCS's attempt to speak with him and assess him. For the first seven months of C.M.'s life, Father provided no gifts or financial support to C.M. While in Mexico, Father's only familiarity with C.M. resulted from watching several videos Mother had provided of her visits with the child.

¶5        Father returned to the United States in June 2024 and began communicating and engaging with DCS. He informed DCS he previously used cocaine and alcohol, and that his last use was in April of that year. Father then began drug testing, as well as having supervised visits with C.M. Though Father first tested negative for drugs, he tested positive for methamphetamines and amphetamines several times between October and December of that year, but later tests were negative.

¶6        In February 2025, DCS moved to terminate Mother's parental rights as to all five children based on substance abuse and 15 months' time in care grounds, A.R.S. § 8-533(B)(3), (8)(c), and Father's parental rights as to C.M. based on abandonment and substance abuse grounds, A.R.S. § 8-533(B)(1), (3).[2] The juvenile court held a termination adjudication hearing on DCS's motion to terminate parental rights and the dependency petition for Father as to C.M.

¶7        As relevant to this appeal, DCS's case manager testified about Mother's substance abuse and services she received. The case manager also described DCS's difficulties in establishing and maintaining contact with Father during the first months of C.M.'s life. She explained that Father did

---

[2]        DCS also moved to terminate the parental rights of the father of E.M., M.M., and J.M., as well as the father of V.M. Though the court terminated these fathers' parental rights, they are not parties to this appeal.

not try to contact or engage with DCS while he was in Mexico, even though she called Father several times without response. The case manager also noted that Father sent no gifts or financial support to the child during this time.

¶8 Father testified about his deportation and efforts to contact C.M. and DCS while in Mexico. Though the case manager testified that visitation with C.M. was available to Father, he testified DCS never offered him video visits or phone calls. As to whether he asked DCS to see C.M. while he was in Mexico, Father testified he did not ask because he did not think DCS would have allowed such visits.

¶9 The juvenile court determined C.M. was dependent as to Father and terminated Mother and Father's parental rights on all grounds alleged by DCS. Addressing abandonment, the court found that Father had good cause for failing to establish his paternity while in Mexico. But the court determined this did not extend to Father's other inactions. The court acknowledged Father had contact with the case manager and was aware of the dependency case but "he failed to appear in court for nearly 8 months." Although Father was not a party at that time, the court explained that "appearing in court [wa]s one way Father . . . could have expeditiously asserted his right to establish an emotional bond with [C.M.]." The court also noted that nothing precluded Father from sending any gifts, supplies, or support to C.M. while he was in Mexico. The court concluded that Father "took no action to establish a parent-child relationship with C.M. from his birth until Father returned to the United States in June 2024." The court also determined that termination would be in the children's best interests. Mother and Father appealed, and we have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

**DISCUSSION**

¶10 Father argues the juvenile court erred by concluding that DCS proved abandonment and substance abuse, and by finding C.M. dependent. Mother argues the court failed to make several necessary findings throughout the dependency and in the termination order.

A.    **Abandonment as to Father**

¶11 Father argues the court's finding of abandonment is contrary to the evidence presented at trial. We will affirm a juvenile court's legal conclusion that clear and convincing evidence supports a statutory ground for termination unless that conclusion is clearly erroneous, meaning "as a matter of law [] no one could reasonably find the evidence to be clear and

4

convincing." *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478–79, ¶ 31 (2023). We accept the juvenile court's factual findings "if reasonable evidence and inferences support them." *Id.* at 478, ¶ 30.

**¶12** A court may terminate parental rights if it finds by clear and convincing evidence that the parent has abandoned the child. A.R.S. §§ 8-533(B)(1), -537(B). "Abandonment" is defined as

> [T]he failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8-531(1).

"[A]bandonment is measured not by a parent's subjective intent, but by the parent's conduct." *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 18 (2000). When a parent faces circumstances that prevent them from "exercising traditional methods of bonding with his child [the parent] must act persistently to establish the relationship however possible and must vigorously assert [their] legal rights to the extent necessary." *Calvin B. v. Brittany B.*, 232 Ariz. 292, 296, ¶ 20 (App. 2013).

**¶13** Our supreme court recently clarified the proper analysis for termination under the abandonment ground. *See In re B.W.*, ___ Ariz. ___, 572 P.3d 88 (2025) (analyzing A.R.S. § 8-533(B)(1)).[3] To trigger the statutory presumption of abandonment, the party seeking termination must present evidence showing a parent (1) failed to maintain a normal parental relationship; (2) for sixth months; and (3) without just cause. *Id.* at 94–95, ¶¶ 17–18. A parent may rebut this presumption by showing, *inter alia*, just cause. *Id.* at 95, ¶ 18. Once a parent presents evidence of just cause, the presumption vanishes, and the court must determine whether the party seeking termination has proven abandonment "as if the presumption had never operated in the case." *Id.* (citation omitted). A parent can likewise

---

[3] *B.W.* was decided two months after the juvenile court's order terminating parental rights, and about a week after Father filed his opening brief. Thus, neither party has addressed how *B.W.* impacts the termination order in this case.

defeat an allegation of abandonment even in cases where the presumption does not apply by demonstrating just cause.

¶14            Our supreme court explained that a parent has "just cause" for failing to maintain a normal parental relationship if they can demonstrate "a reasonable and fair justification for not maintaining a normal parental relationship with the child" and that the parent "relied on that justification in good faith." *Id.* at 96, ¶ 24. Determining whether a parent has "just cause" for failing to maintain such a relationship involves examining "whether the parent is acting to maintain a normal parent-child relationship"; however, courts must also "consider additional facts and circumstances that may have fairly and reasonably impacted [the parent's] understanding of what conduct was feasible and any resulting consequences." *Id.* at 97, ¶ 25. Thus, courts must consider "additional factors that may impact a parent's ability or belief as to his ability to assert his rights." *Id.*

¶15            In *B.W.*, the father was charged with first-degree murder and conspiracy to commit first-degree murder, and the mother was a key witness for the prosecution in father's trial. *Id.* at 92–93, ¶¶ 4–5. On advice of defense counsel, the father did not contact the mother about their child for several years, and because the child was in the mother's custody, the father did not attempt to parent the child. *Id.* at 93, ¶¶ 5–6. The juvenile court terminated the father's rights based on the six-month language in A.R.S. § 8-531(1). *Id.* at 93, ¶ 8. On appeal, the father contended he had just cause for his inaction. *Id.* at 93, ¶ 11. The supreme court reversed the termination order and remanded for the juvenile court to reconsider its holding, finding "[t]he record on appeal is unclear as to what specific advice Father received from his criminal defense attorney, the nature of Father's pretrial release conditions, and the attendant circumstances that may have influenced what he believed he could do to maintain a normal parental relationship with B.W. given his perceived legal jeopardy." *Id.* at 97, ¶ 29.

¶16            Father contends his arrest and deportation interfered with his ability to have a normal relationship with C.M. While we acknowledge the challenges Father's deportation presented in establishing a typical parental relationship with C.M., Father offered no evidence that his circumstances prevented him from taking any other actions to try to begin developing some type of bond or relationship with C.M. Father never sent any gifts to C.M., nor did he send or offer to send the child any financial support. As the DCS caseworker testified, except for the one instance when Mother called DCS, Father did not communicate with DCS about C.M. while Father was in Mexico; when DCS tried to set a meeting with him, he did not

respond. Father acknowledged he never asked the case manager how C.M. was doing or why the child was in the care of DCS.

¶17 Similarly, Father did not ask DCS about ways he could visit or see C.M. while he was in Mexico. Though Father testified he did not think DCS would permit him to visit or see his child, such belief does not absolve him of the need to make some kind of effort to establish a relationship with his child. *Cf. In re Pima Cnty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 97 (1994) (explaining, in the context of abandonment, "the message, put simply, is this: do something, because conduct speaks louder than words or subjective intent").

¶18 Nor does *B.W.* justify Father's inaction. Unlike *B.W.*, in which the parent was advised by counsel that he should not even try to contact his child, 572 P.3d at 93, ¶ 5, nothing in the record suggests Father was similarly dissuaded from contacting DCS regarding C.M. Even assuming as true that Father believed DCS would deny his request for visitation with the child, there is no evidence that Father believed he *could not* have made the request. A significant difference exists between a parent who does not see or communicate with their child because their attorney has told them it would jeopardize their defense to a charge of murder, *id.* at 93, ¶¶ 5–6, and a parent who does not communicate with DCS merely because he anticipates they will deny his requests. Further, the record contains no evidence suggesting Father was unable to ask DCS about sending supplies, gifts, or financial support to C.M. while he was in Mexico. Because sufficient evidence supports the juvenile court's finding that Father did not act persistently to assert his parental rights, and because he provided no evidence he had just cause for his inaction, we cannot say the court clearly erred in finding abandonment.

¶19 To be clear, we do not affirm the court's abandonment finding based solely on Father's deportation. Indeed, the juvenile court found that Father's deportation made certain actions (i.e., establishing paternity) unreasonably difficult. Rather, we affirm based on those actions Father could have done, or at the least attempted, but failed to do. The record demonstrates that DCS had Father's contact information by March 22, 2024 and tried to speak with and assess him for services, but Father did not respond. The DCS case manager testified she tried to call Father approximately five times (using the same phone number Father used when he returned to the United States) but received no response. Even assuming there was some issue with that number, Father had the ability to contact DCS through Mother if needed. Nothing precluded Father from at least attempting to send gifts or cards or providing other types of support for C.M. Father's inaction provides sufficient support to affirm the juvenile

court's termination order. *See In re B.W.*, 572 P.3d at 96, ¶ 22 (explaining that "a 'normal parental relationship' exists when a parent provides the support and contact with the child that a parent who abandoned the child has failed to offer").

**¶20**        Our dissenting colleague believes remand is necessary to give Father the chance to present, and the juvenile court the opportunity to consider, evidence that he had just cause for failing to maintain a normal parent-child relationship with C.M.  Though the dissent notes the juvenile court only mentions just cause a single time in its termination order, Father never raised the issue.[4]  Further, nothing in the record suggests Father was precluded from presenting whatever evidence he had to show just cause for his inaction.  Nor does the record indicate the juvenile court missed the mark in applying the statutory criteria for abandonment, including the "just cause" inquiry.  In the motion for termination, DCS alleged in part that Father "failed to maintain a normal relationship with [C.M.] without just cause."  In the termination ruling, the court quoted the abandonment statute and outlined the evidence showing Father's inaction for more than six months.

**¶21**        The record shows Father was able to contact DCS regarding C.M.  And even if there is some reason not evident in the record that prevented Father from using his own phone while in Mexico, Father could have tried to contact DCS through Mother or other avenues.[5]  The dissent is correct that Father actively participated with DCS after returning to the United States, but his post-abandonment actions do not negate the seven months in which he took no action to establish, or even start, a relationship with C.M.  *Cf.  Maricopa Cnty., Juv. Action No. JS-1363*, 115 Ariz. 600, 601 (App. 1977) (rejecting the notion that post-petition "attempts to reestablish a parental relationship" can defeat the finding of abandonment after the petitioner has established prima facie evidence of abandonment).  Thus, although he was deported, Father did not provide any justification for failing to do whatever was possible to establish a relationship with C.M.

**¶22**        Because we affirm the juvenile court's finding of abandonment, we need not address the court's decision to terminate Father's parental rights based on substance abuse.  *Michael J.*, 196 Ariz. at

---

[4]        Father does not mention just cause in his opening brief; nor did he file a reply brief, where he could have addressed the supreme court's reasoning in *B.W.*

[5]        DCS records also show Mother was consistently commuting to visits with the children from Mexico.

251, ¶ 27 ("Because we affirm the trial court's order granting [termination] on the basis of abandonment, we need not consider whether the trial court's findings justified [termination] on the other grounds announced by the court.").

### B.    Dependency as to Father

**¶23**    Father also argues the evidence did not support an adjudication of dependency.  Because we affirm the termination of Father's rights, his challenge to the dependency is moot.  *See Sandblom v. Corbin*, 125 Ariz. 178, 182 (App. 1980) ("[A] case becomes moot when an event occurs, . . . which renders the relief sought either impossible or without practical effect on the parties to the action.").

### C.    Requirement to Consider Guardianship

**¶24**    Mother does not challenge the court's findings on the statutory grounds for termination.  Instead, she argues the court committed reversible error by not considering whether a permanent guardianship, rather than termination of her parental rights, would have been in the children's best interests.  However, Mother never raised this issue to the juvenile court, and thus she has waived it on appeal unless she can establish fundamental error resulting in prejudice.  *See Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 452, ¶ 21 (App. 2007); *Brenda D. v. Dep't of Child Safety*, 243 Ariz. 437, 447, ¶ 37 (2018).  And despite Mother's argument to the contrary, waiver applies even when a parent alleges the unobjected to lack of findings are required by law.  *Christy C.*, 214 Ariz. at 452,  ¶¶ 20, 21.

**¶25**    Notwithstanding waiver, Mother's position is not persuasive.  She argues the court needed to consider if a permanent guardianship would have been a suitable alternative to termination.  Her argument rests on her reading of *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470 (2022).  That case involved termination of parental rights under the length of sentence ground, which allows a court to terminate parental rights if the parent is convicted of a felony, and "the sentence of that parent is of such length that the child will be deprived of a normal home for a period of years."  A.R.S. § 8-533(B)(4).  After examining the meaning of "normal home" in § 8-533(B)(4), our supreme court held in *Timothy B.* that juvenile courts should "consider whether another person is willing to be the child's permanent guardian and if the grounds for a permanent guardianship exist, including that a guardianship would be in the child's best interests" before terminating parental rights on that ground.  252 Ariz. at 477, ¶ 27.  Mother argues *Timothy B.*'s reasoning should extend to several other statutory

grounds for termination, including those on which the court terminated her rights. We disagree.

**¶26** The supreme court rooted its holding in *Timothy B.* on the "normal home" language in § 8-533(B)(4); the grounds on which the juvenile court terminated Mother's rights do not include similar language. *See* A.R.S. §§ 8-533(B)(3) ("[T]he parent is unable to discharge parental responsibilities because of . . . a history of chronic abuse of dangerous drugs, controlled substances or alcohol and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period."); -533(B)(8)(c) ("The child has been in an out-of-home placement for a cumulative total period of fifteen months or longer . . . the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future."). We decline Mother's request to extend the reasoning of *Timothy B.* to the statutory grounds for termination here.

**¶27** Mother acknowledges that *Timothy B.*'s reasoning relied on the "normal home" language. Yet she contends that extending its holding to other termination grounds is appropriate based on several policy arguments. Setting aside the merits of Mother's policy arguments, "this court is not free to amend the unambiguous language of our statutes to conform to our own notions of public policy." *In re Pinal Cnty. Mental Health No. MH-201000029*, 225 Ariz. 500, 506, ¶ 20 (App. 2010), *superseded by statute on other grounds*, *as recognized in In re Pima Cnty. Mental Health No. MH20130801*, 237 Ariz. 152 (App. 2015). Public policy concerns do not allow us to read the "normal home" language in *Timothy B.* into the other statutory grounds for termination.

**¶28** Moreover, Mother's policy concerns are unavailing. She argues that restricting *Timothy B.* would encourage parents in dependency actions "to commit felonies in order to preserve their parental rights." Mother likewise raises concerns that our reading of *Timothy B.* will result in "gamification" by petitioners to avoid guardianships. As an example, she explains that a petitioner with a felony sentence two years or longer will necessarily satisfy the 15 months' time in care ground, A.R.S. § 8-533(B)(8)(c), and thus a petitioner could avoid any consideration of a guardianship under *Timothy B.* by simply waiting and alleging a ground for termination that does not require such analysis. But as DCS points out, any parent may move the court to consider a guardianship during a dependency proceeding under A.R.S. § 8-872. We find Mother's concerns about the implications of our reasoning unpersuasive.

### D.    Kinship Placement

**¶29**        Mother also contends the juvenile court erred by failing to make statutorily required determinations of whether a relative could have acted as a suitable placement for the children, both throughout the dependency proceedings and in the order terminating her parental rights. *See* A.R.S. §§ 8-829(A)(4) ("If a child has been removed from the child's home, the court . . . shall make the following determinations . . . [i]f the child is not placed with a grandparent or another member of the child's extended family including a person who has a significant relationship with the child within sixty days after the child is removed from the child's home, why such placement is not in the best interests of the child."); -847(E)(1) ("At any periodic review hearing the court shall determine . . . [w]hether the department has identified and assessed placement of the child with a relative or person who has a significant relationship with the child."); -538(C) ("If the court finds that placement with a grandparent or another member of the child's extended family including a person who has a significant relationship with the child is not in the child's best interests, the court shall make specific written findings in support of its decision.").

**¶30**        Mother also argues there was evidence of a suitable kinship placement and any findings by the court to the contrary were an abuse of discretion.    However, as with her arguments related to guardianship, Mother did not object to the court's lack of findings, and we will reverse only on a showing of fundamental error. *Brenda D.*, 243 Ariz. at 447, ¶ 37.

**¶31**        As to Mother's argument that the court had to make findings about a potential kinship placement in its termination order, Mother lacks standing to challenge any placement determination after her rights were terminated. *See In re O.M.*, 254 Ariz. 543, 545, ¶ 9 (App. 2023).  And to the extent that Mother argues the court erred by failing to make such findings during the dependency, she has not shown fundamental error.

**¶32**        Under that standard of review, Mother needs to show the court's error was prejudicial. *Brenda D.*, 243 Ariz. at 447–48, ¶ 38.  Mother must affirmatively prove prejudice by showing that a reasonable fact finder could have reached a different result — she cannot rely on mere speculation. *Id.* at 448, ¶ 38.  Mother's briefing highlights several potential family members who might have served as a placement rather than the foster family, but she provides no evidence the resulting placement would have changed.  Thus, even assuming the court erred by failing to make findings about potential kinship placement during the dependency, Mother has not shown she was prejudiced by the error.

**CONCLUSION**

¶33         We affirm.

**B E C K E, J.,** concurring in part and dissenting in part:

¶34         I agree with the superior court's termination of Mother's rights and therefore join in ¶¶ 1–10 and ¶¶ 24–32 of the majority decision. I must respectfully depart from my colleagues with regard to the termination of Father's rights based on abandonment.

¶35         Father did not abandon C.M.; Father was deported.

¶36         The superior court found—by clear and convincing evidence—the existence of two grounds for the termination of Father's parental rights: abandonment under A.R.S. § 8-533(B)(1) and substance abuse under A.R.S. § 8-533(B)(3). The majority declines to address the superior court's substance abuse finding for good reason—it is untenable. A review of the evidence in the light of our supreme court's recent guidance on abandonment in *In re B.W.*, ___ Ariz. ___, 572 P.3d 88 (2025), shows the abandonment finding to be just as untenable.

**I.        The Superior Court Abused Its Discretion in Terminating Father's Rights Based on Substance Abuse.**

¶37         C.M. was born in early October 2023. His Father was incarcerated in California at that time and did not learn until a week later that C.M. had been born. Father was deported to Tijuana, Baja California, Mexico on November 23, 2023 and later made his way to Nogales, Sonora, Mexico.

¶38         Father returned to the United States in May 2024. On June 3, 2024, he contacted DCS by telephone and met with the DCS case manager on June 7. Father—then 48 years old—reported he had abused alcohol and cocaine when he was in his 20s but admitted to drinking and using cocaine as recently as April 2024. DCS noted Father to be "willing to engage in [] services," "already ha[d] a job," and was "working hard to be able to . . . get an apartment."

¶39        By June 11, Father had completed paternity testing, which confirmed for the first time that he was C.M.'s father. He completed hair follicle drug testing on July 12, with negative results as to all substances. DCS's September 9, 2024 progress report stated Father was testing negative for all substances, engaging in weekly supervised visitation with C.M., had stable employment, and had secured appropriate housing.

¶40        DCS's November 22, 2024 progress report said that Father "ha[d] been consistent with his engagement with [DCS] and ha[d] mostly tested negative for substances" while noting that he had twice tested positive for methamphetamine in late October and early November. The report went on to state:

> [Father] has demonstrated notable progress, maintaining steady employment as a team lead at a construction company and actively supporting [Mother] and the household financially. He has consistently engaged with [DCS] and completed most of his scheduled drug tests, with only minor setbacks. [Father's] commitment to visitation and participation in [C.M.'s life] highlights his dedication as a father.

¶41        Two of Father's seven tests in December 2024 were positive for methamphetamine, so he was referred by DCS to Terros for substance abuse treatment. Father completed his intake assessment with Terros on February 7, 2025. He reported that he had a history of alcohol abuse and a DUI in 2002 but had not consumed alcohol for the preceding six months. He also reported that the first time he had ever used amphetamines was in 2024. Father denied ever receiving any kind of substance abuse treatment in the past. He was diagnosed with mild alcohol use disorder in early remission and mild amphetamine abuse disorder.

¶42        Father began Terros's standard outpatient program in early February 2025—a treatment program that was to last eight months and the first treatment Father had ever received. A month later, in its March 10, 2025 report, DCS reported that, in contrast to the fathers of V.M., E.M., M.M., and J.M., Father "is actively engaging with the Department. He has been regularly testing and participating in the substance abuse program. [He] also has stable housing and a steady job."

¶43        Just over two weeks later, DCS argued to the superior court that—by clear and convincing evidence—Father was "unable to discharge parental responsibilities because of . . . a history of chronic abuse of dangerous drugs, controlled substances or alcohol and there [were]

reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." § 8-533(B)(3). The superior court agreed. I believe it abused its discretion in so concluding.

¶44        Given that parents have a fundamental liberty interest in the "care, custody and management of their child," *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), termination of the parent-child relationship "should be resorted to only when concerted effort to preserve the relationship fails," *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 581, ¶ 20 (2021) (cleaned up). This principle applies to terminations for chronic substance abuse, *Jennifer G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 450, 453, ¶ 12 n.3 (App. 2005), and requires the state to "provide a parent with the *time and opportunity* to participate in programs designed to improve the parent's ability to care for the child," *Mary Ellen C. v. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 37 (App. 1999) (emphasis added).

¶45        Although Father began engaging with DCS services in June 2024, he did not begin drug treatment until February 2025. That delay is explained by the fact that, until his positive drug tests in late October and early November 2024, *DCS did not believe Father needed drug treatment*. Father provided a negative hair follicle test in June 2024 and a series of negative urine drug screens in the months that followed. Only when he failed several tests in late 2024 was he referred for drug treatment.

¶46        Once that referral occurred, Father consistently tested negative for all substances. He was described by DCS as "engaging" and "actively participating" in his substance abuse treatment. His progress reports from Terros were "favorable." He was about a month and a half into the eight-month treatment program when the termination adjudication hearing occurred.

¶47        Although our standard of review is highly deferential to the superior court's findings of fact, we can reject those findings when they are "clearly erroneous." *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58, ¶ 9 (App. 2015). The superior court concluded—by clear and convincing evidence—that Father was (1) unable to discharge his parental responsibilities, (2) because of chronic drug abuse, and (3) that his drug abuse would continue for "a prolonged indeterminate period." In light of the evidence presented, all three findings are clearly erroneous.

¶48        But even if the court's conclusions about Father's drug abuse were supportable, DCS must do more. It has a constitutional obligation to provide Father with the "time and opportunity" to participate in programs designed to address his drug abuse. *Mary Ellen C.*, 193 Ariz. at 192, ¶ 37.

Proceeding with a termination adjudication hearing just weeks after Father began (and more than six months before he would have completed) drug treatment for the first time in his life does not meet that obligation. I would reverse the superior court's judgment terminating Father's parental rights based on § 8-533(B)(3).

## II. The Superior Court Should Have the Opportunity to Consider the Abandonment Ground for Termination in Light of *In re B.W.*

**¶49** Following the termination adjudication hearing in late March, the court issued its order terminating Father's parental rights on May 2, 2025. On July 17, 2025, our supreme court issued its opinion in *In re B.W.*, __ Ariz. __, 572 P.3d 88 (2025). That opinion marked a substantial shift[6] in the analysis employed by Arizona courts when considering claims of abandonment under § 8-533(B)(1).

**¶50** Before the supreme court's opinion in *In re B.W.*, "just cause" was not treated as an exception to abandonment. Instead, it was "merely a rebuttal" to the "presumption of abandonment" contained in § 8-531(1): "[f]ailure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes *prima facie* evidence of abandonment." *See In re B.W.*, 1 CA-JV 23-0202, 2024 WL 1172862, at *3, ¶ 18 (Ariz. App. Mar. 19, 2024) (mem. decision), *rev'd*, 572 P.3d 88 (2025). In other words, a finding of "just cause" would only dispel the evidentiary presumption of abandonment when a parent had not maintained a normal parental relationship for six months. The existence of "just cause" did nothing to excuse a parent's failure "to provide reasonable support and to

---

[6] "It is the general rule that when there is a change of law by judicial decision between the time of trial and the time of appeal the appellate court will dispose of the case according to the law prevailing at the time of the appellate disposition and not according to the law prevailing at the time of rendition of the judgment appealed." *Arnold v. Knettle*, 10 Ariz. App. 509, 511 (1969); *accord State v. Evans*, 252 Ariz. 590, 595, ¶ 11 (App. 2022) ("Any change in the law, whether procedural or substantive, applies to cases on direct review, even if the defendant's trial has already concluded.") (citing *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987)). However, *In re B.W.* is not, strictly speaking, a "change in the law," rather it is our supreme court's clarification of what the law has always been. *See Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 n.12 (1994) (clarifying that, when interpreting a statute, an appellate opinion is a declaration of what the law "had always meant"); *accord O'Brien v. Escher*, 204 Ariz. 459, 465, ¶ 21 (App. 2003).

maintain regular contact with the child" or a parent making "only minimal efforts to support and communicate with the child." § 8-531(1).

¶51　　　　The superior court's order terminating Father's rights reflects that understanding of abandonment. Despite 25 pages of detailed findings, the order mentions "just cause" only once: a single recitation of the definition of abandonment contained in § 8-531(1). The order contains no analysis of just cause, nor does it analyze whether Father's deportation could constitute just cause. To be fair, until *In re B.W.* was decided by our supreme court, there was no reason for the superior court to conduct that analysis. Nor was there good reason for Father to offer evidence showing why his deportation was just cause for his failure to "provide reasonable support and to maintain regular contact with" C.M. Because just cause was not considered an exception to abandonment, the existence of just cause would not have negated a finding of abandonment.

¶52　　　　But our understanding of abandonment shifted when the supreme court decided *In re B.W.* Even "where abandonment is presumed, if a parent can show 'just cause' for failing to maintain a normal parental relationship under the circumstances, the claim of abandonment fails as unproven." *In re B.W.*, __ Ariz. at __, ¶ 19, 572 P.3d at 95. "'[J]ust cause' is an exception to abandonment." *Id.*

¶53　　　　"[P]arents have 'just cause' when they had a reasonable and fair justification for not maintaining a normal parental relationship with the child and relied on that justification in good faith." *Id.* at __, ¶ 24, 572 P.3d at 96. When determining whether a parent has abandoned a child, the "court must also consider additional facts and circumstances that may have fairly and reasonably impacted [the parent's] understanding of what conduct was feasible and any resulting consequences." *Id.* at ___, ¶ 25, 572 P.3d at 97.

¶54　　　　In making that determination, the "court should examine what a parent has done to facilitate a normal parental relationship[,] but it must also consider that the parent's conduct—***or ability to 'do something'***—may be affected by a parent's reasonable, good faith belief that circumstances exist that preclude the parent from exercising traditional methods of maintaining a normal parental relationship." *Id.* at ¶ 26 (emphasis added).

¶55　　　　Although the court heard no direct evidence regarding Father's personal circumstances during the period of his deportation, there is strong circumstantial evidence that the deportation was a significant obstacle to Father's ability to establish and maintain a parental relationship

with C.M. That evidence is simply this: Father did not communicate[7] with DCS or C.M., or attempt to visit C.M., during the period of his deportation (and the record does not suggest any way he could have done so). Yet immediately upon Father's return to the United States, Father was fully engaged with DCS and took every opportunity to visit with C.M. The difference between Father's engagement during the deportation and his engagement afterwards can only be described as "night and day."

**¶56** The stark difference between Father's parenting conduct while the obstacle of deportation existed and his conduct once that obstacle was removed illustrates that the fact of his deportation may be the "but for" cause of Father's failure to maintain a parental relationship with C.M. In light of the gravity of the constitutional rights at issue and the supreme court's opinion in *In re B.W.*, Father should have the opportunity to present, and the superior court should have the opportunity to consider, evidence of whether Father's deportation was "just cause" for that failure.

**¶57** I would vacate the superior court's termination of Father's parental rights as to C.M. and remand for a hearing where Father's evidence of "just cause" can be considered. For that reason, I respectfully dissent.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**: JR

---

[7] The evidence reflects that DCS first obtained Father's contact information on March 22, 2024. The DCS case manager testified that she tried calling Father several times and sent him a single text message but was not able to "have a conversation" with him until he returned to the United States in June 2024.